Argued and submitted March 14, 2014, reversed and remanded
December 9, 2015, petition for review denied June 30, 2016 (359 Or 847)

**BILLY LEE OATNEY, JR.,**
*Petitioner-Appellant,*

*v.*

Jeff PREMO,
Superintendent,
Oregon State Penitentiary,
*Defendant-Respondent.*

Marion County Circuit Court
04C12723; A147931

369 P3d 387

Daniel J. Casey argued the cause and filed the briefs for appellant.

Timothy A. Sylwester, Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, Laura S. Anderson, Assistant Attorney General, and Jeremy C. Rice, Assistant Attorney General.

Before Nakamoto, Presiding Judge, and Sercombe, Judge, and Egan, Judge.*

SERCOMBE, J.

---

* Sercombe, J., *vice* Armstrong, P. J.

**SERCOMBE, J.**

In 1998, a jury found petitioner guilty of eight counts of aggravated murder for killing an acquaintance. The same jury determined that petitioner should be sentenced to death, and the trial court imposed that sentence. On direct review, the Supreme Court affirmed. *State v. Oatney,* 335 Or 276, 66 P3d 475 (2003), *cert den,* 540 US 1151 (2004). In 2004, petitioner filed this action against defendant superintendent, seeking post-conviction relief, ORS 138.510 to 138.680, on numerous grounds, including that his trial counsel provided inadequate and ineffective assistance of counsel under Article I, section 11, of the Oregon Constitution and the Sixth and Fourteenth Amendments to the United States Constitution during petitioner's trial by failing to seek suppression of statements and testimony derived from a statement that petitioner made about the murder in exchange for a promise of immunity from the district attorney. The post-conviction court rejected petitioner's claims and entered a judgment denying relief. Petitioner appeals, raising 25 assignments of error. We conclude that trial counsel performed inadequately in failing to move to suppress statements and testimony of petitioner's co-conspirator, Willford Johnston, because Johnston's statements were used in violation of the immunity promised by the district attorney. We further conclude that counsel's inadequate performance prejudiced petitioner. Accordingly, the post-conviction court erred in failing to grant post-conviction relief. Our conclusion obviates the need to consider petitioner's remaining assignments of error. We reverse and remand.

## I. UNDERLYING FACTS

We begin with the facts regarding the underlying crime and petitioner's criminal trial, which we take from the Supreme Court's opinion on direct review. We state the facts in accordance with the post-conviction court's findings that are supported by the record, as well as the undisputed facts. *Montez v. Czerniak,* 355 Or 1, 8, 322 P3d 487, *adh'd to as modified on recons,* 355 Or 598, 330 P3d 595 (2014). We set out additional facts later in the opinion.

"The victim disappeared on August 27, 1996. Her family told police that defendant might have information about

her whereabouts because the victim had been planning to meet with defendant to ask him to make some jewelry for her upcoming wedding. On September 2, 1996, the Tualatin police interviewed defendant, who stated that he had not seen the victim for three weeks. Later that evening, a Milwaukie police officer, who had no knowledge of the Tualatin police's questioning of defendant regarding the victim's disappearance, stopped defendant because the license plate light on his van was not working. Defendant's license check revealed no reason to detain him, but the police determined that defendant's passenger, Johnston, had an outstanding warrant for his arrest for a parole violation. The police arrested Johnston.

"During the traffic stop and investigation of Johnston, one of the police officers saw defendant and Johnston moving a duffel bag inside the van as if to conceal it. The officer asked defendant for consent to look into the bag, and defendant consented. The police found, among other things, a replica of a Colt .45, a stun gun, a dart gun, a large knife, a lock-pick set, a pair of scissors, and a roll of duct tape. The police inventoried the items and returned them to defendant, but did not detain him further.

"On September 9, 1996, the victim's badly decomposed body was found in Champoeg Park. In a subsequent interview with defendant, the Tualatin police learned of Johnston's September 2, 1996, arrest. They listened to tapes of Johnston's telephone conversations with defendant from jail and learned that defendant might have been involved in the victim's disappearance.[1] Over the next few weeks, the Tualatin police interviewed defendant several times. They also searched defendant's apartment and found blood matching the victim's blood on the carpet.[2] The Tualatin police continued to keep defendant under surveillance. After obtaining a search warrant, the police searched defendant's van. Among other items, they found the items from the duffel bag that the Milwaukie police had found during the September 2, 1996, stop.

"Meanwhile, as a result of the continuing investigation of the victim's death, the state charged Johnston with one count of aggravated murder. Johnston pleaded guilty to aggravated murder, and, in exchange for his cooperation and testimony, the state agreed not to seek the death penalty.

"Defendant was ultimately charged with eight counts of aggravated murder. At trial, both defendant and Johnston testified. Johnston testified that, while he was staying with defendant at defendant's apartment, defendant said that he had a date with the victim, left the apartment, and brought the victim back with him later that evening. While Johnston was on the telephone in another room, he heard defendant's stun gun being used. Johnston returned to the living room and saw the victim on the floor with defendant holding his stun gun to her neck. Johnston and defendant then tied up the victim and took her to the bedroom. They cut off her clothes with scissors and [Johnston] raped and [both Johnston and petitioner] sodomized her. After forcing her to give them the personal identification number to her bank card, defendant sent Johnston out to get some money from an ATM using the victim's card. When Johnston returned, he saw that the victim had blood on her face and was not moving. Johnston testified that defendant had told him that defendant had hit and choked the victim because she 'just wouldn't [have sex with] me.' Defendant said that he had tried to kill her, but 'the [victim] just won't die.' Defendant and Johnston then held a plastic bag over the victim's head until she stopped breathing.

"Defendant argued at trial that Johnston had lied in his testimony to avoid the death penalty. Defendant testified that Johnston had killed the victim while defendant was away from the apartment. According to defendant, he had not learned of the victim's murder until the following day. He testified that he had helped Johnston cover up the murder because he had been afraid of being implicated in the murder because it had occurred in his apartment.

"The jury convicted defendant of all eight counts of aggravated murder. In a separate sentencing proceeding, the jury determined that defendant had acted deliberately, that defendant posed a continuing risk to society, and that defendant should receive a death sentence. The trial judge then entered a sentence of death. After defendant's conviction, the court sentenced Johnston to life without the possibility of parole.

---

"1 The police suspected that Johnston and defendant were using a code to discuss plans to dispose of the victim's property. For example, the two men discussed their desire to

dispose of 'camping stuff' and the possibility of having a 'garage sale.' Police were familiar with that type of code, which they suspected that defendant and Johnston had learned while in prison together for previous offenses.

"2 Defendant had vacated the premises, and his former landlord had consented to the search."

*Oatney*, 335 Or at 278-80 (third and fourth brackets in original).

As that rendition of the facts demonstrates, at petitioner's criminal trial, petitioner and Johnston agreed that the murder had been committed at petitioner's apartment. That was further evidenced by the fact that the police discovered the victim's blood on the carpet in the apartment. Johnston testified that he and petitioner committed the sexual assault and murder together; petitioner testified that Johnston committed the sexual assault and murder alone and that petitioner only helped him clean up the apartment and dispose of the victim's belongings. The state also presented out-of-court statements that Johnston made during the investigation. Apart from Johnston's testimony and out-of-court statements, the state presented no direct evidence that petitioner participated in the sexual assault and murder. Thus, the case ultimately amounted to a credibility contest between petitioner and Johnston.

## II.  POST-CONVICTION CASE AND APPLICABLE LAW

In his first amended petition for post-conviction relief, petitioner alleged, as relevant here, that trial counsel provided inadequate and ineffective assistance by "[f]ail[ing] to file *** motions to suppress evidence and statements obtained by investigators as a result of statements" that petitioner made to police on October 23, 1996. In petitioner's view, his statement was made in exchange for a promise of immunity and, accordingly, evidence and statements derived from his statement would have been suppressed. Petitioner also alleged that trial counsel provided inadequate and ineffective assistance by "fail[ing] to argue for suppression of all of Mr. Johnston's statements after 10-23-96 on the grounds that they were obtained as a result of information obtained during [petitioner's] 10-23-96 statement."

In his trial memorandum to the post-conviction court, petitioner contended that trial counsel should have argued that Johnston's statements implicating petitioner "were derivative of * * * petitioner's [immunized] statement" because the record demonstrated that Johnston would not have cooperated with the police in the absence of petitioner's statement.

After brief testimony before the post-conviction court, the parties submitted their arguments and evidence in written form. The court rejected all of petitioner's claims in 76 pages of findings and conclusions. As relevant here, the court's findings are as follows:

"Many of petitioner's claims are premised on an 'immunized statement' that he made to the police and the district attorney on October 23, 1996, before he was arrested. The investigators and district attorney 'immunized' petitioner's statement only to the extent that they promised not to use that statement or any evidence derived from it in a prosecution against petitioner.

"At trial, petitioner's trial counsel moved to suppress the statements petitioner made during the October 23, 1996, meeting and any evidence derived from those statements, the state did not oppose the motion, and the trial court granted it. The state complied with that ruling and its part of the parties' agreement by not using the statement, or any evidence derived from that statement, against petitioner in the prosecution in *State v. Oatney*.

"After petitioner's trial counsel made some passing reference to the interview in their opening statement, the prosecutor argued that petitioner had 'opened the door' to the statement's use as evidence. The district attorney again argued later, that a reference during [petitioner's girlfriend's] testimony to a meeting with police on October 23, 1996, was another use by the defense of the statement they had earlier sought to be excluded.

"On February 17, 1998, the trial court held a hearing outside the presence of the jury regarding possible use by the state of the October 23, 1996, 'immunized statement.' Petitioner's trial counsel argued that they had not opened the door at all to allowing use of the October 23, 1996, statement, and that such use would very likely constitute a violation of petitioner's constitutional rights. The trial

court ruled that the October 23, 1996, statement could be used by the state if it so chose.

"Immediately after the trial court ruled, the prosecutor expressed concerns about using the October 23, 1996, statement because of the nature of the agreement between the state, through him as its representative, and petitioner, and those parts of the recorded interview that referred to his agreement with petitioner. The prosecutor was concerned that the statement would have to be admitted in its entirety, and that the 'immunity' aspects of the statement would confuse the jury. The district attorney ultimately chose not to use the statement, and no additional references to the October 23, 1996, statement petitioner gave to the police were made by either side during [the] criminal trial.

"Petitioner did not prove that any evidence presented at trial by the state was, in fact, derived from his October 23, 1996, statement and would not have been discovered through the ongoing investigation.

"Petitioner did not prove that the state violated in any respect the trial court's ruling or the parties' agreement.

"Petitioner's testimony at trial was consistent with his October 23, 1996, statement, and he did not prove that he suffered any prejudice from any alleged use of the statement by the state that would entitle him to post-conviction relief."

(Paragraph numbers and citations omitted.) The court also found that

"[p]etitioner's trial counsel did not believe that the state's action in obtaining Johnston's statement violated petitioner's agreement with the district attorney or that using Johnston's testimony against petitioner at trial violated either the agreement or the trial court's pretrial ruling. Trial counsel did not believe that the state violated petitioner's immunity agreement at any point in the trial. Consequently, petitioner's trial counsel did not move to suppress any evidence other than petitioner's statement itself. Petitioner never expressed to his counsel that he had any contrary understanding of his immunity agreement."

The post-conviction court denied relief.

Petitioner appeals, contending that the post-conviction court erred in denying him relief because, *inter*

*alia*, he proved that trial counsel performed inadequately in failing to seek suppression of Johnston's statements and testimony. We begin by summarizing the law applicable to petitioner's post-conviction claims. Then, we set out the facts relevant to petitioner's arguments on appeal. Finally, we turn to petitioner's arguments themselves.

Article I, section 11, and the Sixth Amendment provide criminal defendants with the right to counsel. "Under both constitutions, 'the defendant's right is not just to a lawyer in name only, but to a lawyer who provides adequate assistance.'" *Montez*, 355 Or at 6 (quoting *State v. Smith*, 339 Or 515, 526, 123 P3d 261 (2005)). Accordingly, the right requires "'adequate performance by counsel' concerning the 'functions of professional assistance which an accused person relies upon counsel to perform on his behalf.'" *Id.* (quoting *Krummacher v. Gierloff*, 290 Or 867, 872, 627 P2d 458 (1981), and citing *Strickland v. Washington*, 466 US 668, 686, 104 S Ct 2052, 80 L Ed 2d 674 (1984)). The Oregon Supreme Court has decided that, as the federal and state law now stands, "the standards for determining the adequacy of legal counsel under the state constitution are functionally equivalent to those for determining the effectiveness of counsel under the federal constitution." *Id.* at 6-7. Nevertheless, we consider claims under Article I, section 11, before reaching Sixth Amendment claims; only if a petitioner is not entitled to relief under Article I, section 11, do we consider his or her arguments under the Sixth Amendment. *Id.* at 7 n 3.

To obtain post-conviction relief for a violation of a petitioner's Article I, section 11, right to counsel, the petitioner must "'demonstrate[] by a preponderance of the evidence that [his lawyer] failed to exercise reasonable professional skill and judgment'" and "'prove[] that counsel's failure had a tendency to affect the result of his trial.'" *Id.* (quoting *Lichau v. Baldwin*, 333 Or 350, 359, 39 P3d 851 (2002) (first brackets in *Montez*)). To obtain relief for a violation of the petitioner's Sixth Amendment right to counsel, the petitioner must demonstrate that his or her trial counsel's performance "fell below an objective standard of reasonableness." *Strickland*, 466 US at 688. On the prejudice prong under the Sixth Amendment, the petitioner must show "a

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*

We are bound by the post-conviction court's findings of historical fact "if there is evidence in the record to support them." *Montez*, 355 Or at 8. "[W]e presume that a [post-conviction] court implicitly resolves factual disputes consistently with its ultimate conclusion" if the factual finding is necessary to the court's ultimate conclusion and is supported by the record. *Pereida-Alba v. Coursey*, 356 Or 654, 670-71, 342 P3d 70 (2015) (citing *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968)). Ultimately, we review post-conviction proceedings for errors of law. *Montez*, 355 Or at 8.

## III. DISCUSSION

As noted above, on appeal, petitioner argues, *inter alia*, that trial counsel performed inadequately in failing to seek suppression of Johnston's statements and testimony, and that that inadequate performance prejudiced him. Petitioner asserts that the immunity agreement entitled him to transactional immunity or, alternatively, use and derivative use immunity. He disputes the post-conviction court's determinations that Johnston's statements and testimony did not derive from petitioner's immunized statement and that, had trial counsel sought to suppress them, they would inevitably have been discovered through the ongoing investigation.

Before setting out the facts underlying petitioner's argument on appeal, we pause to address preservation. Defendant contends that petitioner's argument on appeal— that both Johnston's statements and his testimony at trial derived from the immunized statement and were subject to suppression—is not preserved for two reasons. First, defendant asserts that petitioner never argued before the post-conviction court that trial counsel should have sought suppression of Johnston's statements in the trial itself; instead, in defendant's view, petitioner asserted only that counsel should have sought suppression of Johnston's statements at various pretrial proceedings.

The petition and some of petitioner's briefing before the post-conviction court organize his claims by date. Although some of petitioner's objections to counsel's failure to seek suppression of derivative evidence are listed under dates that suggest they could be self-contained claims unrelated to the evidence presented at trial—for example, a claim that counsel should have sought suppression of evidence derived from petitioner's statement at a release hearing—others are clearly aimed at suppression of derivative evidence presented at trial. Specifically, petitioner listed the following allegation of inadequate assistance under the date of an omnibus hearing: Counsel "[f]ailed to file subsequent motions to suppress evidence and statements obtained by investigators as a result of [petitioner's] 10-23-96 statement." Although that allegation is listed among claims relating to the omnibus hearing, it relates to the evidence that was presented at trial, not to suppression of evidence and statements at the omnibus hearing itself.

We turn to defendant's second preservation argument. Defendant contends that, before the post-conviction court, "petitioner never argued or claimed that Johnston's *in-court* testimony should have been excluded as derivative of the immunized statement." (Emphasis in original.) Instead, in defendant's view, petitioner challenged only Johnston's out-of-court statements. Contrary to that view, however, we understand petitioner's challenge to trial counsel's failure to seek suppression of Johnston's "statements" to relate to both his out-of-court statements and his trial testimony. In the post-conviction petition, petitioner contended that trial counsel performed inadequately, among other things, in "fail[ing] to argue for suppression of all of Mr. Johnston's statements after 10-23-96 on the grounds that they were obtained as a result of information obtained during [petitioner's] 10-23-96 statement." In his trial memorandum, petitioner explained that counsel should have argued "that Mr. Johnston's statements of and after 10-23-96 were derivative of the petitioner's statement." Given that Johnston's statements implicating petitioner (which the state presented at trial) and Johnston's trial testimony contained the same information—that is, Johnston's testimony was essentially a live restatement of his last statement to

the police—petitioner's reference to Johnston's statements "of and after 10-23-96" was sufficient to notify the court, and defendant, that Johnston's trial testimony was at issue. *See, e.g., State v. Walker*, 350 Or 540, 548, 258 P3d 1228 (2011) ("[T]he rule of preservation gives a trial court a chance to consider and rule on a contention, thereby possibly avoiding an error altogether or correcting one already made, which in turn may obviate the need for an appeal"; it also ensures fairness to opposing parties so that "parties are not taken by surprise, misled, or denied opportunities to meet an argument." (Internal quotation marks omitted.)). In fact, those arguments did notify defendant and the court that Johnston's trial testimony was at issue. Defendant drafted the post-conviction court's findings, which included a finding that "[p]etitioner's trial counsel did not believe that the state's action in obtaining Johnston's statement violated petitioner's agreement with the district attorney or that *using Johnston's testimony against petitioner at trial violated either the agreement or the trial court's pretrial ruling.*" (Emphasis added.) Petitioner preserved the argument that he raises on appeal.

Turning to the merits, we begin by describing the circumstances surrounding petitioner's immunity agreement and the procedural history of petitioner's criminal trial. Then we consider his legal arguments. We agree with petitioner that he has shown that trial counsel failed to exercise professional skill and judgment in failing to seek suppression of Johnston's statements and testimony as derivative of petitioner's immunized statement and that the inadequate performance prejudiced petitioner. Because we conclude that petitioner is entitled to relief based on the denial of his Article I, section 11, right to counsel, we do not reach his contentions under the Sixth Amendment.

A. *Additional Facts*

1. *Criminal investigation and immunity agreement*

We begin with the circumstances surrounding petitioner's statement to the police made in exchange for a promise of immunity. Before petitioner was arrested, he and his girlfriend at the time, Scalf, engaged attorney Ryan to represent them. Up to that point in the investigation, petitioner

had repeatedly denied to the police that he knew anything about the victim's disappearance. He had told the police that he had not seen the victim, who was an acquaintance, for about three weeks. Petitioner's goal in retaining Ryan was to have the police leave him alone.

Petitioner "expressly assured" Ryan that he was not involved in the victim's disappearance. Ryan, who had no experience practicing criminal law, believed petitioner. Ryan informed petitioner that he was not required to speak with the police. The post-conviction court found that petitioner "freely chose to continue to cooperate with the police, and so Ryan helped to facilitate his cooperation." (Internal quotation marks and brackets omitted.) Petitioner eventually informed Ryan that, "although he was not involved in the murder, he knew who was." Again, Ryan believed petitioner's assertion that he was not involved. According to Ryan, at that point, petitioner "freely chose to continue to cooperate with the police, and so [Ryan] continued to help to facilitate his cooperation." To that end, Ryan arranged for petitioner to disclose what he knew to police and the district attorney on October 23, 1996, in exchange for a promise that his statement and derivative evidence would not be used against him.

On October 23, Ryan and petitioner met with two police detectives and the district attorney at Ryan's office. We set out their conversation in detail below. Here, it suffices to note that the Washington County District Attorney, Upham, promised petitioner that "anything you say during the course of this interview" and "any information that we derive from what you tell us" "cannot ever be used against you." Petitioner then made what we refer to in this opinion as his immunized statement: He told the detectives that, on the night of August 27, Johnston had murdered the victim at petitioner's apartment while petitioner was at the Wichita Pub until midnight or 12:30 a.m., that Johnston had driven the victim's Jeep to her apartment and stolen several items from her apartment, and that, the next day, petitioner had helped Johnston dispose of the victim's clothing and items that Johnston had stolen from the victim's apartment. Petitioner's statement was tape recorded. After he made the bulk of the statement, the detectives asked for petitioner's

permission to play a tape of his statement for Johnston, and petitioner agreed.

Later the same day, detectives interviewed Johnston, who was in custody on an unrelated charge, and played part of petitioner's statement for him. Until that point, despite repeated attempts by the police to get information about the murder from Johnston, Johnston had refused to speak to the police about the murder and asserted that he had never met the victim. However, at the end of the last interview, Johnston had said that the victim "wasn't [his] type." Immediately after the detectives played part of petitioner's statement—in which, as noted above, petitioner said that Johnston had committed the murder alone—Johnston's face turned beet red, and he clenched and shook his fists. He then immediately asserted that petitioner had committed the crime. He was interviewed several times over the next two days, and, eventually, during those interviews, he asserted that he and petitioner had committed the crime together. He testified to a very similar version of events, described above, at petitioner's trial. Petitioner was arrested for the murder the next day, October 24, 1996, and Ryan's representation of petitioner ended when petitioner was arrested. Trial counsel, Manning and Brennan, were appointed to represent petitioner after his arrest.

### 2. *Procedural history of petitioner's criminal trial*

Johnston did not agree to plead guilty until the summer of 1997. As a result, petitioner and Johnston were codefendants at several pretrial hearings. Trial counsel moved for separate release hearings, arguing that, as a result of Upham's immunity agreement with petitioner, none of Johnston's statements were admissible against petitioner because they derived from petitioner's immunized statement. The court denied the motion but agreed that, because of the immunity agreement, it would not consider Johnston's statements as evidence against petitioner. During the joint release hearing, the court also sustained several objections by trial counsel to Johnston's statements being used against petitioner.

The court ultimately denied release to both petitioner and Johnston. At a joint omnibus hearing that followed, the

focus was on Johnston's pretrial motions because his trial was scheduled before petitioner's. The court planned to hold a later hearing on any pretrial motions that pertained only to petitioner. During the joint omnibus hearing, Johnston decided to plead guilty; accordingly, the rest of the hearing was cancelled.

When proceedings resumed in petitioner's case, trial counsel did not pursue the theory that Johnston's statements were derived from petitioner's immunized statement and, accordingly, could not be used against him. Trial counsel moved to suppress petitioner's statement and derivative evidence, and the trial court granted the motion, but counsel never again identified Johnston's statements—or any other evidence apart from references to petitioner's immunized statement itself—as derivative of petitioner's statement.

At trial, petitioner's trial counsel referred to the fact that petitioner had told the police what he knew on October 23 and elicited testimony from Scalf that petitioner had spoken with the police on October 23. The state argued that, through those references, trial counsel had "opened the door" to the state's use of the statement. The trial court ruled that petitioner had waived the benefit of his agreement with the state and, accordingly, that the statement could be used by the state. However, as noted above, the post-conviction court found that the state nevertheless did not use petitioner's statement at trial.

Johnston's pretrial statements and testimony were the only direct evidence that petitioner participated in the sexual assault and murder of the victim. Petitioner testified at trial, and his testimony was consistent with the immunized statement. As noted above, petitioner was convicted of eight counts of aggravated murder and sentenced to death.

B.  *Inadequate Assistance of Counsel*

 1.  *The immunity agreement*

We turn to petitioner's arguments on appeal. As noted above, the post-conviction court found, without elaboration, that "[t]he investigators and district attorney 'immunized' petitioner's statement only to the extent that they promised not to use that statement or any evidence derived

from it in a prosecution against petitioner." The parties' arguments on appeal, explained below, demonstrate that more specific interpretation of the agreement is necessary to resolve the dispute. Specifically, as we will explain, the parties debate the meaning of "evidence derived from" petitioner's statement. Accordingly, we begin by interpreting the immunity agreement.

As an initial matter, the parties dispute the legal consequence of Upham's undisputed promise of immunity. Petitioner contends that, under *State v. Soriano*, 68 Or App 642, 684 P2d 1220, *aff'd and opinion adopted*, 298 Or 392, 693 P2d 26 (1984), and *State v. Vondehn*, 348 Or 462, 236 P3d 691 (2010), regardless of the terms to which he and Upham agreed, he was entitled to transactional immunity, that is, that he was immune from prosecution for "any offense to which the statements relate." *Vondehn*, 348 Or at 469 (defining transactional immunity). Defendant responds that case law on compelled testimony, including *Soriano*, is inapposite because petitioner's statement was not compelled. Instead, defendant contends, "[t]he question is simply whether the state violated its agreement with petitioner"; to answer that question, we should "look[] to the terms of the agreement itself and interpret[] those terms according to contract principles."

The case law does not support petitioner's argument. In *Soriano*, we held, and the Supreme Court agreed, that Article I, section 12, of the Oregon Constitution does not permit the state to compel testimony absent a grant of transactional immunity. 68 Or App at 662; 298 Or at 394; *see also Vondehn*, 348 Or at 469 ("In *Soriano*, this court held that the Oregon Constitution prohibits the state from requiring a witness to relinquish the Article I, section 12, right against self-incrimination unless it provides the witness with an alternative that affords the same protection as the constitution."). The court reversed the defendants' convictions for contempt, which had been entered after they refused to testify under a statutory grant of use and derivative use immunity. *Soriano*, 68 Or App at 665. The statute was unconstitutional because it did not provide transactional immunity, and, accordingly, the defendants could not be punished for refusing to testify under it. *Id.*

We have subsequently explained, however, that Article I, section 12, protects only the right not to be compelled to testify against oneself; it does not, in itself, confer transactional immunity whenever that testimony is given. *State v. Graf,* 114 Or App 275, 281, 835 P2d 934 (1992) (*Graf I*), *aff'd,* 316 Or 544, 853 P2d 277 (1993). In *Graf I*, a state employee was investigated for theft, and, at a pretermination hearing before his employer, the Department of Transportation (DOT), he testified about his conduct. 114 Or App at 278. Then he moved to dismiss criminal charges pending against him based on the same conduct, arguing that his testimony at the pretermination hearing had been compelled and, accordingly, that he was entitled to transactional immunity. *Id.* The trial court agreed and dismissed some of the pending criminal charges. *Id.* at 278-79.

On appeal, we first concluded that the defendant had been compelled to testify at the pretermination hearing under both Article I, section 12, and the Fifth Amendment to the United States Constitution, because he had faced adverse consequences if he did not testify. *Id.* at 280. Then, after explaining the holding in *Soriano*, we explained that a

"[d]efendant's constitutional right is the right not to be compelled to testify against himself, not a right to immunity. *Immunity is not \* \* \* an automatic consequence of having been compelled to testify*; in Oregon, at least, it must be conferred by statute. Although *Soriano* holds that a statute that confers only use and derivative use immunity in exchange for the compelling of testimony violates Article I, section 12, we did not rewrite the statute to confer transactional immunity on the witness. Rather we held that the witness could not be convicted of contempt for refusing to testify."

*Graf I*, 114 Or App at 282 (emphasis added).

We explained that, in the case before us—where "there is no statute authorizing DOT to grant immunity to defendant"—the defendant's "decision to testify, even under compulsion, does not automatically confer transactional immunity on him." *Id.* Instead, if the defendant had chosen not to testify at the pretermination hearing, "he could have tested the constitutionality of any adverse consequences, as did Soriano." *Id.* Accordingly, we held, "having testified

under compulsion without a grant of immunity, [the defendant] is left with the usual remedy against unconstitutionally compelling testimony: suppression of his testimony before DOT, and any evidence derived therefrom, in the criminal proceeding." *Id.* We reversed the dismissal of the charges and remanded for a trial with the DOT testimony and derivative evidence to be suppressed.

Thus, Article I, section 12, does not, in itself, *provide* transactional immunity. Instead, Article I, section 12, protects a defendant from any "adverse consequences" of refusing to testify in the absence of a grant of transactional immunity. *Graf I*, 114 Or App at 282. That suggests that, when a defendant voluntarily waives his right to remain silent in exchange for a grant of immunity, Article I, section 12, does not require immunity.

The Supreme Court's disposition of *Graf* confirms that conclusion. The Supreme Court affirmed our opinion in *Graf I* on a different ground. *State v. Graf*, 316 Or 544, 853 P2d 277 (1993) (*Graf II*). The court disagreed with our first conclusion; in its view, the defendant had not been "compelled to testify" at the pretermination hearing. *Id.* at 550. Given that conclusion, the court explained, "we do not reach the transactional immunity issue." *Id.* at 552. Thus, the Supreme Court reasoned, the mere fact that the defendant had testified before DOT about the conduct that gave rise to the criminal charges—that is, the fact that he voluntarily waived his right to remain silent—did not entitle him to transactional immunity. *See also Vondehn*, 348 Or at 474 (noting that the Article I, section 12, right to remain silent "is *** subject to waiver"; *Miranda* warnings are required when a person is subjected to custodial interrogation "[b]ecause a custodial interrogation is inherently compelling, and to ensure the validity of a waiver of the right against self-incrimination").

We have applied contract principles to ascertain whether a defendant is entitled to transactional immunity rather than the default remedy that we identified in *Graf I*—use and derivative use immunity—for a violation of Article I, section 12. In *State v. Beugli*, 126 Or App 290, 294, 868 P2d 766, *rev den*, 320 Or 131 (1994), the defendant,

a state trooper, had been charged with several crimes after an internal investigation by the Oregon State Police (OSP). The trial court had dismissed the charges after concluding that the defendant was entitled to transactional immunity because he had been compelled to respond to questions during the internal investigation. *Id.* at 292. On appeal, the state conceded that, during the internal investigation, it had compelled the defendant's testimony. *Id.* at 294. However, it argued that "the legislature did not grant defendant transactional immunity as a substitute for his right against self-incrimination and * * * OSP neither expressly nor impliedly promised that defendant would receive transactional immunity." *Id.* at 294-95.

We agreed with the state. First, we concluded that the legislature had not provided transactional immunity through the collective bargaining statutes. Then we considered, and rejected, the defendant's alternative argument that "the state nevertheless expressly [promised transactional immunity] in the collective bargaining agreement." *Id.* We analyzed the text of the agreement and agreed with the state that the articles of the agreement that provided the exclusive remedies for violations did not promise transactional immunity either implicitly or explicitly. *Id.* at 296. Accordingly, the defendant was not entitled to transactional immunity; instead, he could "seek only the usual remedy against unconstitutionally compelled testimony, the suppression of his statements and evidence derived from them." *Id.* at 297.

Those cases demonstrate that, here, defendant was not entitled to transactional immunity under Article I, section 12. Under *Graf II*, Article I, section 12, does not provide transactional immunity for a defendant who voluntarily waives his right against self-incrimination in the absence of compulsion. Furthermore, as demonstrated by *Beugli*, if no statute grants transactional immunity to a defendant whose testimony has been compelled, we consider whether the state has promised transactional immunity in a contract.[1]

---

[1] As we understand petitioner's argument, he does not contend that, even if he is not entitled to transactional immunity in exchange for voluntarily waiving his right against self-incrimination under Article I, section 11, he is nevertheless

For our purposes here, the law is the same under the Fifth Amendment. When a person independently enters into an agreement with a prosecutor to provide information in exchange for some type of immunity, the resulting informal immunity agreement is governed by contract principles. *United States v. Wilson*, 392 F3d 1055, 1059-60 (9th Cir 2004); *see also In re Ellis/Rosenbaum*, 356 Or 691, 746 n 45, 344 P3d 425 (2015) (an immunity agreement that "involves a promise that the defendant will be immune from prosecution in exchange for providing information or otherwise assisting the government" "requires a meeting of the minds between the parties" (internal quotation marks omitted)).

With the understanding that the immunity to which petitioner was entitled was the immunity that Upham promised, we return to the facts. As described above, on October 23, 1996, petitioner met with police detectives and Upham at the office of petitioner's then-counsel, Ryan. The interview was recorded and informally transcribed. The parties agree that the recorded and transcribed discussion constitutes the complete immunity agreement; no written agreement was ever contemplated or created. Close to the beginning of the interview, the following exchange took place between petitioner and Upham:

"[Upham]: Okay. Um, we have not talked before, um, so we're going to kind of go through this agreement and make sure that everybody's on the same wavelength. Is that okay with you?

"[Petitioner]: Yes.

"[Upham]: Okay. It's my understanding from talking to your attorney last night and this morning, um, that you are currently prepared to tell the entire truth about your knowledge of the events surrounding the death of [the victim]. Is that right?

"[Petitioner]: Yes.

---

entitled to use and derivative use immunity as a constitutional matter, regardless of the terms of his agreement with the district attorney. Instead, we understand his alternative argument to be only that, even if the scope of immunity is governed by the terms of the immunity agreement, those terms entitle him to use and derivative use immunity. As explained below, we agree.

"[Upham]: Um, I'd like to tell you at this time, uh, that we, myself as the District Attorney of Washington County, are prepared to tell you that anything you say during the course of this interview cannot ever be used against you. Okay?

"[Petitioner]: Okay.

"[Upham]: Or any information that we derive from what you tell us. For instance, if you tell us that, uh, a piece of property is someplace and we go find that piece of property, we can't use that discovery against you and you alone.

"[Petitioner]: All right.

"[Upham]: Okay? Um, what we'd like to see happen is that you tell us the entire truth, um...that the State Police detectives who are here and others have an opportunity to go verify your story. This is just (inaudible) to determine whether you're in fact telling the entire truth. Um, furthermore, uh, if they deem it necessary to put you on a lie detector, or polygraph, to determine, you know, through that source whether or not you're being completely candid with everybody. Um, so far are those terms acceptable to you?

"[Petitioner]: Yes.

"[Upham]: Um, and if all of those things check out, and if you had no involvement at all in this murder or in the disposal of the body, um, then we can be, then we, and after we check out your information, then we can discuss, uh, prosecution and immunity from prosecution. So at this point, um, you're going to basically tell us what you know and we're going to promise you that anything you tell us will not be used against you.

"[Petitioner]: All right.

"[Upham]: Is that okay with you?

"[Petitioner]: Yes.

"[Upham]: Do you have any questions at all?

"[Petitioner]: Not at this time.

"[Upham]: Okay. Well, I don't want to—I don't want anybody to think that you're being tricked or promised or

forced to participate in telling us, uh, about your knowledge of these events.

"[Petitioner]: That's not my interpretation of (inaudible).

"[Upham]: Okay, does anybody have that interpretation that's here in the room?

"[Ryan]: No. Um, this is Mike Ryan, [petitioner's] attorney. I believe that we understand each other.

"[Upham]: Okay. So [we're not] talking about whether or not you're going to be charged with anything at this juncture, we're just simply saying to you, you tell us everything you know and we promise we will not use any of that information against you. But the most important thing I can tell you, [petitioner], at this time is, uh, we're assuming that you are not involved in the homicide. Uh, but it is critically important that you tell us everything, and you don't leave anything out. Because if you—that is really fundamentally important—before we proceed into the interview. Are you willing to do that?

"[Petitioner]: Yes.

"[Upham]: Okay. And if other people were involved, or have knowledge of this, people that you know, you're going to have to tell us who those people are as well.

"[Petitioner]: All right.

"[Upham]: Are you prepared to do that?

"[Petitioner]: Yes.

"[Upham]: Does anybody have anything that they wanted to add to this preliminary discussion?

"[Unidentified speaker]: No.

"[Detective Glover]: I think everything's clear to me.

"[Upham]: I really—I really do want to make this crystal clear as possible * * * so there's no misunderstanding down the road as to what the purpose of this interview is. And the purpose is just simply to gain information from you with the promise that the information will never be used against you.

"[Petitioner]: (inaudible)

"[Upham]: And if something happens down the road, we can discuss that at a later time.

"[Petitioner]: Okay.

"[Upham]: Okay? With that, I'll, uh, turn it over to the detectives."

After that discussion, petitioner made a lengthy statement in which he asserted that Johnston, acting alone, had raped and killed the victim at petitioner's apartment and disposed of the victim's body and that petitioner had helped Johnston dispose of the victim's property and clothing. Much later in the interview, the following exchange took place:

"[Petitioner]: I was upset because, uh, I don't have a way of proving this. This is what's kept me quiet the whole time, you know. I don't have an alibi. Nobody was with me. It's [Johnston's] word against mine. Um, he can tell you just about anything. Um, I don't know what he'll tell you and I can't prove otherwise.

"[Detective Glover]: Would you mind if when we go down and inter—we're going to interview [Johnston]. That we play a portion of this tape to him?

"[Petitioner]: (inaudible) matter if you tell him or play it.

"[Detective Glover]: Would you—would that—would you mind if we did that?

"[Petitioner]: I guess not.

"[Detective Glover]: Okay."

At the end of the interview, Upham reiterated his original understanding of the agreement:

"[Upham]: I just want to make clear that, you know, the purpose of this interview, there's no deals given to you. It's just—the only deal is that everything you have told us cannot be used against you in any fashion whatsoever.

"[Petitioner]: All right.

"[Upham]: Okay? And the purpose of the interview is that, and that the officers are then going to go and try and verify as much information as they possibly can to determine whether or not there's independent evidence to

support your statement. Because you hit the nail right on the head. It's going to be one of these. Him pointing the finger at you and you pointing the finger at him.

"[Petitioner]: Yeah."

Finally, one of the detectives reconfirmed petitioner's permission to play the tape for Johnston:

"[Detective Hampton]: (inaudible) excuse me, a part of [the follow-up investigation of petitioner's statements] is contacting [Johnston] and we'll do that as soon as we can and just to verify that you don't have a problem with us using this tape in our interview.

"[Petitioner]: I don't have a problem with you using it, no. Not that it's going to matter one way or another.

"[Hampton]: Okay. Just to make sure you don't have a problem with it.

"[Petitioner]: I don't—I don't imagine him saying okay, I confess.

"[Hampton]: Well, stranger things have happened and that's what we'll hope for. If he even—

"[Petitioner]: Yeah. I hope so.

"[Hampton]: Well, that might be an avenue we can use and so we just want to make sure you're agreeable to that.

"[Petitioner]: The way [Johnston]'s been lying recently' and running scams on me and his girlfriend and my brother. I can't even imagine it now."

Petitioner contends that the agreement precluded the prosecution from using against him any evidence obtained through investigation of the information he disclosed in the immunized statement, including Johnston's statements and his subsequent testimony to the same information. In interpreting a contract, we employ the methodology set out in *Yogman v. Parrott*, 325 Or 358, 937 P2d 1019 (1997): We examine the text, context, and extrinsic evidence of the circumstances underlying the contract's formation to decide whether the contract is ambiguous. *Batzer Construction, Inc. v. Boyer*, 204 Or App 309, 315, 129 P3d 773, *rev den*, 341 Or 366 (2006). If a term is ambiguous, the trier of fact resolves the ambiguity through reference

to extrinsic evidence of the parties' intent. *Yogman*, 325 Or at 363-64. Here, we conclude that the immunity agreement unambiguously provided that, in exchange for petitioner's information about the murder, the district attorney would not use against petitioner (1) petitioner's statement itself, (2) any physical evidence discovered as a result of petitioner's statement, or (3) information discovered as a result of follow-up interviews, including the interview of Johnston.

Defendant first contends that the agreement did not prohibit the state from presenting evidence "gathered from other witnesses[,] * * * even if discovered in the context of an investigative follow-up from petitioner's interview." In defendant's view, when Upham said that "any information that we derive from what you tell us" "cannot ever be used against you," he meant *only* that, as he explained by way of example, "if you tell us that * * * a piece of property is someplace and we go find that piece of property, we can't use that discovery against you." In support of that argument, defendant contends that we should refer to an ordinary dictionary definition of the word "derived" and conclude that, here, Upham used that word in a narrow sense when he promised that "any information that we derive from what you tell us" would not be used against petitioner.

We disagree. In the context of an immunity agreement, the parties could not reasonably have understood Upham's promise that "anything you say during the course of this interview" and "any information that we derive from what you tell us" "cannot ever be used against you" to be anything but a promise of use and derivative use immunity. In the context of immunity, the word "derive" is a legal term of art. *See, e.g., Soriano*, 68 Or App at 648 (discussing "the derivative use problem" in the history of immunity statutes). "Derivative evidence" is any evidence obtained by use— evidentiary or nonevidentiary—of the immunized statement. *See, e.g., id.* (identifying "use of the [immunized] testimony to search out other evidence against the witness" as derivative use); *id.* at 664 (explaining that, under derivative use immunity, the prosecution bears the burden of proving "that its proposed evidence is without taint" and "that its case is unaffected by prohibited non-evidentiary use," which requires "the prosecution to open up its investigatory

process to thorough examination" (citing *Kastigar v. United States*, 406 US 441, 460-61, 92 S Ct 1653, 32 L Ed 2d 212 (1972)); *see also United States v. Plummer*, 941 F2d 799, 804 (9th Cir 1991) (derivative use is use of "information from the interview to uncover other incriminating evidence"); *United States v. Pielago*, 135 F3d 703, 710-11 (11th Cir 1998) (where the government used immunized statements of the defendant to indict Hechevarria and then entered into a plea agreement with Hechevarria in exchange for Hechevarria's promise to testify against the defendant, "by its very nature, Hechevarria's testimony [at the defendant's trial] was derivative evidence"); *cf. Plummer*, 941 F2d at 805 (a promise of use immunity in an agreement governed by contract principles "presumptively includes derivative use immunity, unless the government can demonstrate in a given case that, at the time the agreement was made, it expressly clarified that only direct use immunity was offered"). Accordingly, defendant's suggestion that we refer to a nonlegal dictionary for its definition is inapposite. *Cf., e.g., State v. Dickerson*, 356 Or 822, 829, 345 P3d 447 (2015) (in interpreting statutes, courts give legal terms "their established legal meanings").

As noted, defendant also relies on Upham's example—"[f]or instance, if you tell us that, uh, a piece of property is someplace and we go and find that piece of property, we can't use that discovery against you and you alone"—in support of its view that the agreement contemplated that only physical evidence, and not information, obtained through petitioner's statement could not be used against him. That example illustrates one type of derivative evidence (physical evidence) that is barred by the agreement, but, given that it was expressly just an example, prefaced by "for instance," it cannot reasonably be understood to narrow the scope of the promise not to use "any information that we derive from" petitioner's statement. That promise not to use any information derived from petitioner's statement was broad—it included Johnston's out-of-court statements and his trial testimony.

The fact that the parties contemplated that "State Police detectives who are here and others [will] go verify your story" also did not negate Upham's promise of

derivative use immunity. As explained above, the only reasonable understanding of the promise of immunity was that it applied to both the evidentiary use of the statement and use of the statement "to search out other evidence," including information, against petitioner. *Soriano*, 68 Or App at 648. Immediately after making that promise, Upham stated that the follow-up investigation "is just (inaudible) to determine whether you're in fact telling the entire truth." Thus, the agreement contemplated that petitioner would make a full statement, that that statement and derivative information and physical evidence would not be used "against you and you alone," and that the state police would investigate what petitioner told them to find out whether it was true.

If, as defendant contends, the parties contemplated that the fruits of the follow-up investigation could be used as evidence against petitioner, then Upham's promise that "any information that we derive from what you tell us" "cannot ever be used against you" was meaningless. That understanding of the agreement is implausible because it would lead to the conclusion that, rather than derivative evidence not "ever be[ing] used against" petitioner, as Upham promised, the evidence that was discovered through investigation of petitioner's statement—that is, all derivative evidence—would be admissible against petitioner. That would conflict with Upham's own example of derivative physical evidence, which, he asserted, could not be used against petitioner. As Upham's repeated promise of immunity attests—including his reiteration, at the end of the interview, that "the only deal is that everything you have told us cannot be used against you in any fashion whatsoever"—the parties intended that petitioner's statement would not be used against him, directly or indirectly.

Thus, the only reasonable understanding of the agreement is that, although the state police would investigate petitioner's statement to determine whether petitioner was telling the truth, any evidence discovered as a result of that investigation would not be admissible against petitioner. Accordingly, we disagree with defendant's argument that the agreement barred the prosecution from using only derivative physical evidence, not evidence from follow-up interviews. As we will explain, the agreement also did not

contain a specific exception for evidence derived from the follow-up interview of Johnston.

As noted, during the interview, after petitioner had made most of his statement, the officers obtained petitioner's permission to play petitioner's statement for Johnston. Petitioner contends that his permission was only for the police to "disclose a portion of his statement to Johnston," not to use any evidence that resulted from that disclosure against petitioner. We agree that that is the only reasonable way to understand the agreement.

We first note that the parties made their agreement regarding immunity at the start of the interview, before petitioner made his statement. Upham promised petitioner use and derivative use immunity and told petitioner that detectives would follow up on petitioner's information to make sure that he was telling the truth. Then petitioner performed his part of the agreement by telling the detectives and Upham what he asserted had happened.

After petitioner had performed his obligation under the agreement, Glover said, "Would you mind if when we go down and inter—we're going to interview [Johnston]. That we play a portion of this tape to him?" Petitioner responded, "[It doesn't] matter if you tell him or play it." Thus, consistent with our interpretation of the agreement, explained above, petitioner reasonably believed that detectives would be following up on his statement, including by interviewing Johnston, in an attempt to confirm petitioner's statement. Given that prior agreement between petitioner and Upham, it did not matter to petitioner whether the detectives played the tape or merely told Johnston that petitioner had accused him of the murder. That is so because, under the terms of the agreement—which, as discussed above, provided derivative use immunity—any statement that Johnston made in response would be derived from petitioner's statement and, accordingly, its use would be prohibited by the immunity agreement. It follows that playing the tape would make no difference in petitioner's right to immunity under the agreement: The detectives could tell Johnston about petitioner's statement or play a tape of petitioner's statement, but, either way, any statement by Johnston in response would not be used against petitioner. Accordingly, petitioner's agreement

that the detectives could play the tape for Johnston had no effect on the terms of the immunity agreement.

That understanding is confirmed by the fact that, after petitioner agreed that the detectives could play the tape of petitioner's statement for Johnston (and not just tell Johnston that petitioner had accused him of the murder), Upham reconfirmed his original promise by explaining that "the only deal is that everything you have told us cannot be used against you in any fashion whatsoever." In context—and particularly in the absence of any suggestion that the scope of the promised immunity had been modified—that statement reiterated the original promise of use and derivative use immunity.

Finally, we disagree with defendant's argument that the state was excused from performing its obligation not to use any derivative evidence against petitioner because petitioner promised to tell the truth and, in defendant's present view, later investigation revealed that he had not told the truth. Defendant contends that the immunity agreement "was premised on petitioner revealing 'the entire truth'" and that he did not do so. Thus, defendant contends, if petitioner's trial counsel had argued that Johnston's out-of-court statements and testimony should have been suppressed as derived from the immunity agreement, the state could have successfully responded that petitioner had committed a material breach of the contract by failing to tell the entire truth and, therefore, that the state was excused from providing the promised immunity. As we will explain, the only determination that the post-conviction court could make on this record is that the parties did not intend Upham's promise of immunity to depend on a later determination that petitioner had told the truth.

We begin with the text and context of the agreement. Upham stated at the outset that he had learned from petitioner's attorney that petitioner was "currently prepared to tell the entire truth about your knowledge of the events surrounding the death of [the victim]." Petitioner said, "[y]es," and Upham immediately made his first and most detailed promise of immunity. Upham then explained that "what we'd like to see happen" is that petitioner would tell

"the entire truth" and that detectives would "have an opportunity to go verify your story" "to determine whether you're in fact telling the entire truth." In addition, Upham obtained petitioner's agreement that, "if [the detectives] deem it necessary [they will] put you on a * * * polygraph, to determine, you know, through that source whether or not you're being completely candid with everybody." He further explained:

> "[A]nd if all those things [(the opportunity to verify petitioner's story and the polygraph, if necessary)] check out, and if you had no involvement at all in this murder or in the disposal of the body, um, then we can be, then we, and after we check out your information, then we can discuss, uh, prosecution and immunity from prosecution. So at this point, um, you're going to basically tell us what you know and we're going to promise you that anything you tell us will not be used against you."

After reconfirming that petitioner was participating voluntarily, Upham continued:

> "So [we're not] talking about whether or not you're going to be charged with anything at this juncture, we're just simply saying to you, you tell us everything you know and we promise we will not use any of that information against you. But the most important thing I can tell you, [petitioner], at this time is, uh, we're assuming that you are not involved in the homicide. Uh, but it is critically important that you tell us everything, and you don't leave anything out. Because if you—that is really fundamentally important—before we proceed into the interview. Are you willing to do that?"

Petitioner agreed, and Upham added, "And if other people were involved, or have knowledge of this, people that you know, you're going to have to tell us who those people are as well." Petitioner agreed. Finally, Upham stated:

> "I really do want to make this crystal clear as possible so there's no misunderstanding down the road as to what the purpose of this interview is. And the purpose is simply to gain information from you with the promise that the information will never be used against you."

The text and context of the agreement suggest that the state's performance of the promise of immunity would not be excused if petitioner did not tell the whole truth.

Although Upham certainly wanted petitioner to tell the truth, and, perhaps even more importantly, wanted petitioner not to omit anything—he communicated that it was "critically important that you tell us everything, and you don't leave anything out," and petitioner agreed to do that—Upham also expressed the expectation that, if the follow-up investigation showed that petitioner was telling the truth, further negotiations would follow: At that point, "we can discuss, uh, prosecution and immunity from prosecution." That possibility of future transactional immunity, combined with Upham's repeated statements that the present agreement was only for petitioner to provide information in exchange for a promise that it would never be used against him, suggests that the promise of immunity applied regardless of the results of the follow-up investigation—that is, regardless of whether, ultimately, the detectives and Upham decided that petitioner had told them the truth. If the investigation revealed that petitioner was not telling the truth, or had omitted information, the penalty would be that no discussion of immunity from prosecution would take place. But Upham's promises of immunity were unconditional; they did not suggest that, if some unspecified person—detectives, Upham, a judge, or a jury—decided that petitioner had not told the truth in every respect, or had left something out, the promised immunity for the whole statement and derivative evidence would evaporate. That is further confirmed by the fact that, at the end of the interview, he stated that "*everything you have told us* cannot be used against you in any fashion whatsoever." (Emphasis added.) That does not create a reasonable understanding that whether the information could be used against petitioner would depend on the results of the follow-up investigation.

To the extent that the text and context of the agreement might be ambiguous because petitioner agreed that he was ready to tell the truth and would not leave anything out, the extrinsic evidence in the record compels the conclusion that the parties did not intend the promise of derivative immunity to be contingent on petitioner telling the whole truth. By the time of petitioner's pretrial motion to suppress the statement and derivative evidence, the state had obtained the evidence on which it now relies in arguing that it should

not be bound by the agreement because petitioner did not tell the truth.[2] Moreover, long before that point, Upham and the detectives had decided that petitioner had not told the truth, as evidenced by the murder charges that were brought against him. However, the record reveals no evidence that the state suggested that it should not be bound by the agreement because petitioner had not told the truth. Instead, when trial counsel sought to enforce the agreement by moving to suppress the statement and derivative evidence, Upham did not oppose the motion, and the court granted it.

A dispute over petitioner's statement that took place during the trial also demonstrates that Upham did not understand his promise to be limited by his or others' determination that petitioner had told the truth. As the post-conviction court found, during trial, the state—specifically, Upham—argued that defense counsel's references to petitioner's October 23 statement to the police, as well as a reference to the statement that defense counsel elicited from Scalf on cross-examination, "opened the door" for the state to use the contents of the statement. In the course of deciding whether the defense had opened the door, the court characterized the statement as follows: "There simply was an agreement, a contract, so to speak, between the parties, that if, in fact, [petitioner] gave a statement, that evidence would not be used against him." Ultimately, the court decided that, because the statement was inadmissible only as a result of an agreement by the parties, and not because it was involuntarily made or otherwise obtained in violation of petitioner's constitutional rights, trial counsel was able to, and did, waive the benefit of the parties' agreement by referring to the statement in opening statements and on cross-examination of Scalf.[3] Immediately after that ruling,

---

[2] Defendant points to the trial testimony of a bartender from the Wichita Pub that, on the night of August 27, 1996, she closed the pub at 10:45 p.m. In petitioner's statement, he said that he had gone to the Wichita Pub that night and had remained there until after midnight. In addition to testifying at trial, the bartender testified before the grand jury; thus, the state had that information very shortly after petitioner's arrest, and long before his motion to suppress.

[3] In the petition, before the post-conviction court, and again on appeal, petitioner asserts that counsel's references to the statement amounted to inadequate assistance insofar as they were able to "open the door" to admissibility of the immunized statement.

Upham expressed concern that, in light of his promise to petitioner not to use the statement against him, the statement remained inadmissible. He did not advance any other reason that the statement might be admissible, and, specifically, he did not argue that his promise of immunity was intended to be contingent on petitioner telling the truth and not leaving anything out, which he had not done. Thus, faced with several opportunities to assert that the agreement was not enforceable because petitioner had not told the truth, Upham did not make that argument or otherwise suggest that that was his understanding of the agreement. Thus, to the extent that there is any ambiguity about whether petitioner telling the whole truth was a term of the agreement, extrinsic evidence conclusively resolves it against defendant's argument.

In sum, Upham promised that no "information that we derive from what you tell us" could be used against petitioner. Petitioner performed his part of the agreement, and nothing the parties discussed thereafter can reasonably be understood to have retroactively modified the scope of the promised immunity. Accordingly, if Johnston's statements and testimony derived from petitioner's immunized statement, their admission at petitioner's trial violated the immunity agreement.

2. *Johnston's statements and testimony derived from petitioner's statement*

We turn to whether Johnston's statements and testimony derived from petitioner's immunized statement. If trial counsel had raised that issue before the criminal trial court, the state would have had the burden of showing that Johnston's statements and testimony were "derived from a legitimate source wholly independent of" petitioner's immunized statement. *Kastigar*, 406 US at 460. Before the post-conviction court, defendant also relied on the inevitable discovery doctrine, contending that its burden before the trial court would have been to show either that purportedly derivative evidence was derived from an independent source or that it would inevitably have been discovered. The post-conviction court agreed and applied that standard. On appeal, petitioner notes but does not challenge that ruling.

Accordingly, we assume, without deciding, that, if the state had proved in the trial court that it inevitably would have discovered Johnston's statements, that would have sufficed to allow their admission despite the immunity agreement.

In this post-conviction proceeding, as petitioner conceded at oral argument on appeal, as part of his burden of proving that trial counsel performed inadequately and trial counsel's failures prejudiced him, petitioner had to demonstrate that, if trial counsel had sought suppression of Johnston's statements, the state would not nevertheless have shown that they were derived from an independent source or inevitably would have been discovered.[4] Petitioner has made the necessary showing.

We begin with the independent source doctrine. Defendant contends that, here, petitioner did not meet his burden of proving that Johnston made his statements and, ultimately, testified against petitioner, because of petitioner's immunized statement. As described below, however, the undisputed evidence is that Johnston made his October 23 statement to the police because of petitioner's statement. Thus, that statement and his immediately subsequent statements, made over the course of the next two days, derived from petitioner's statement, not from any independent source. Likewise, given the facts here—where Johnston's statements resulting from petitioner's statement were, essentially, a confession that led directly to his arrest on aggravated murder charges and his testimony at petitioner's trial mirrored those statements—Johnston's testimony also derived from petitioner's immunized statement.

As explained above, Johnston denied any involvement in the victim's murder to the police on several occasions. On October 20, during an interview with detectives

---

[4] This issue can be characterized as part of either the performance prong or the prejudice prong of our analysis. As to the former, if the state had been able to show that the evidence was derived from an independent source, that might help support a conclusion that not every reasonable trial attorney would have sought suppression. As to the latter, even if counsel performed inadequately in failing to seek suppression, petitioner was not prejudiced by the inadequacy if the evidence would not have been suppressed. For analytical convenience, we discuss the issue as part of the performance prong; our conclusion here also applies to our consideration of prejudice.

Altman and Glover, Johnston and Glover became angry with each other and the interview was terminated. At that interview, although he had previously denied meeting the victim, Johnston asserted that the victim was "not [his] type." On October 23, the same day petitioner made his immunized statement, detectives played part of the tape of the immunized statement for Johnston. When he heard the tape, Johnston's face became beet red and he clenched and shook his fists. He cursed, then immediately accused petitioner of the murder. The police interviewed Johnston several times over the next two days; Johnston's statements evolved over the course of those interviews, and he admitted participating in the sexual assault and murder of the victim along with petitioner. Petitioner was arrested on October 24. Both petitioner and Johnston were charged with aggravated murder, and Johnston eventually agreed to plead guilty in exchange for testifying against petitioner. At petitioner's trial, Johnston essentially repeated the final version of the murder that he had told the detectives on October 25.

Given those facts, Johnston's statements and testimony derived from petitioner's statement, not from any independent source. The only permissible inference from the circumstances is that the detectives' act of playing the tape of petitioner's statement caused Johnston to be angry with petitioner and that, as an immediate result, he accused petitioner of the murder. The subsequent interviews, at which Johnston developed his story that he and petitioner had committed the murder together, were the direct result of Johnston's statement made on October 23 as a result of hearing the tape of petitioner's statement. Essentially, petitioner's statement caused Johnston to implicate petitioner in the sexual assault and murder and to confess his own participation. That information caused both Johnston and petitioner to be charged with murder, and Johnston's plea agreement was predicated on his testimony against petitioner. Johnston's trial testimony mirrored the final version of events that he gave to the police on October 25. Thus, petitioner proved that Johnston's statements and trial testimony derived from petitioner's statement, not an independent source. *See Pielago*, 135 F3d at 710-11 (Hechevarria's trial testimony against the defendant was derivative evidence because it was obtained

through a plea agreement on charges brought against Hechevarria based on information in the defendant's immunized statement).

Likewise, if trial counsel had sought suppression of Johnston's statements, the state would not have been able to show that the inevitable discovery doctrine allowed their admission. "The inevitable discovery doctrine permits the prosecution to purge the taint of illegally obtained evidence by proving, by a preponderance of the evidence, that such evidence inevitably would have been discovered, absent the illegality, by proper and predictable police investigatory procedures." *State v. Miller*, 300 Or 203, 225, 709 P2d 225 (1985), *cert den*, 475 US 1141 (1986). That burden is a heavy one. *See id.* at 226 ("It is not enough to show that the evidence 'might' or 'could have been' otherwise obtained."); *id.* at 227 ("When the evidence is well concealed * * *, the state will have to make a more exact showing of how * * * the discovery would have occurred.").[5]

Here, the record requires the conclusion that the state would not have met that burden. As explained above, Johnston had consistently denied any involvement in the murder. On October 20, Johnston and one of the detectives had gotten so angry at each other that the interview had to be terminated. The next day, upon hearing petitioner's accusation, Johnston became very angry and accused petitioner of the murder. Given those undisputed facts, the state could not have shown that, even in the absence of petitioner's statement, Johnston would have—not just might have—made the statement that he did and that statement would have resulted in his making the same subsequent statements and, eventually, testifying at petitioner's trial. *See Gable v. State of Oregon*, 203 Or App 710, 728, 126 P3d 739, *rev den*, 341 Or 216 (2006) (where the post-conviction record contains affirmative evidence that a petitioner never waived a constitutional right and no evidence to support the state's contrary position, the petitioner has met his burden of proof). In sum, petitioner met his burden of showing

---

[5] Because petitioner has not raised the issue, we assume that the inevitable discovery doctrine can properly apply to a statement, rather than physical evidence.

that, in the absence of his immunized statement, the state would not inevitably have obtained Johnston's statements or testimony.

Thus, the record does not support the post-conviction court's determination that Johnston's statements and testimony did not derive from petitioner's statement or would inevitably have been discovered.

3. *Trial counsel's failure to seek suppression of Johnston's statements was unreasonable.*

We have concluded that the immunity agreement prohibited the state from introducing evidence derived from petitioner's statement and that Johnston's statements and testimony derived from petitioner's statement. Accordingly, if trial counsel had sought suppression of Johnston's statements, they would have been suppressed. The remaining question is whether no reasonable trial counsel would have failed to seek suppression. In answering it, we "make every effort to evaluate [trial counsel's] conduct from [counsel's] perspective at the time, without the distorting effects of hindsight." *Lichau*, 333 Or at 360.

We begin by considering what trial counsel knew at the relevant time. Trial counsel knew that, before his arrest, petitioner had been represented by Ryan and that Upham had promised petitioner immunity in exchange for petitioner's statement of what he knew. By the time of a discovery hearing in April 1997, almost a year before petitioner's trial began, counsel had, and had read, the transcript of the agreement and petitioner's statement. Based on the agreement, counsel argued that, although Johnston's statements could be used against Johnston, they could not be used against petitioner. Although trial counsel later moved to suppress petitioner's statement and derivative evidence and the court granted the motion, trial counsel never again argued that Johnston's statements were derived from petitioner's immunized statement and, accordingly, could not be used against him. The trial record does not reflect any reason for that omission, and trial counsel's affidavits merely assert that counsel did not believe that Johnston's statements and testimony were covered by the immunity agreement, without any explanation for that belief. Nor does

defendant advance any possible strategic reason for trial counsel to abandon the position that Johnston's statements were inadmissible.

The post-conviction court found that trial counsel did not believe that Johnston's statements or testimony were covered by the immunity agreement. We have concluded that Johnston's statements and testimony were covered by the agreement. At a minimum, however, any reasonable trial attorney would have recognized that the agreement was susceptible to argument about whether Johnston's statements and testimony were covered. We also note that it is obvious—and, indeed, was obvious to trial counsel, as demonstrated by the fact that they raised it at the release hearing—that, as a factual matter, Johnston's statements and testimony derived from petitioner's immunized statement. Under those circumstances, and given the high stakes, namely, possible exclusion of critical state's evidence in a death penalty case, any reasonable counsel would have raised the issue and argued that the agreement applied to Johnston's statements. Regardless of counsel's subjective belief, apparently belatedly arrived at, that Johnston's statements and testimony were not covered by the agreement, the failure to raise the issue meant that counsel missed opportunities to have the trial court rule in their client's favor and to have the issue decided favorably by the Supreme Court on direct review. The potential benefit was exclusion of evidence critical to the state's case. We perceive, and defendant has identified, no possible detriment. Accordingly, trial counsel failed to exercise reasonable professional skill and judgment in failing to seek suppression of Johnston's statements and testimony.

## C. *Prejudice*

We readily conclude that trial counsel's inadequate performance prejudiced petitioner. Defendant raises no argument to the contrary. Because Johnston's statements and testimony were derived from petitioner's immunized statement, were not independently discovered, and would not inevitably have been discovered, they would have been suppressed if counsel had raised the issue. As we have noted, the statements and testimony were the centerpiece of the

state's case against petitioner and the only direct evidence of petitioner's involvement in the sexual assault and murder of the victim. The admission of Johnston's statements and testimony, which was the direct result of counsel's inadequate performance, tended to affect the outcome of petitioner's trial.

In conclusion, petitioner's trial counsel performed inadequately when they failed to seek suppression of Johnston's statements and testimony as derivative of petitioner's immunized statement. That failure prejudiced petitioner. Accordingly, we reverse and remand for the post-conviction court to grant petitioner post-conviction relief on his first claim.

Reversed and remanded.