HADLOCK, J.
*269 In this consolidated case, defendant appeals from a judgment of conviction for fourth-degree assault constituting domestic violence; he also appeals from judgments finding him in violation of his probation in two other cases, based on his new criminal conduct. The assault conviction relates to injuries that defendant's domestic partner suffered in the parking lot of a nightclub. It is undisputed that the victim was hurt that night; the only issue at trial was whether defendant caused the injuries by hitting her. On appeal, defendant contends that the trial court erred by admitting evidence that he had slapped the victim on a previous occasion. The state responds that the evidence was admissible to counter evidence that defendant himself elicited, which could have suggested to the jury that he had not previously assaulted the victim. We agree with the state and, accordingly, affirm all three judgments.[1]
We summarize the testimony relevant to the trial court's decision to admit the disputed evidence and review the trial court's admission of the evidence for errors of law. State v. Stapp , 266 Or. App. 625, 626, 629, 338 P.3d 772 (2014).
Defendant and his domestic partner, M, were together at a nightclub late one night in July 2015. Cowger, a woman who worked at the nightclub, saw a man and M arguing in the parking lot; the man then grabbed M by the hair, swung forcefully, and hit her hard with a closed fist two or three times. After the man stopped hitting her, she yelled, "No, Mario." Mario is defendant's first name. Cowger asked her friends for assistance; when they went to see M, she reported that she had not been hit, but had fallen.
Officer Black was dispatched to the nightclub. When he arrived, he found M, who was upset, crying, and had blood on her face, shirt, and hands. Black asked M, "Was it your boyfriend?" M became really upset and said *270 that she did not want to get her boyfriend in trouble. M gave Black her boyfriend's name, and Black was able to identify him as defendant. Black then asked M again what had happened, and she said that she was assaulted by a different man. Upon being questioned further, M said that she was too drunk and had fallen, injuring herself. However, M told a responding paramedic that "she was punched in the nose, punched in the head, her hair pulled, and then another fist to her head." M did not tell the paramedic *672 who had hit her. At trial, M expressly denied that defendant had hit her. Instead, she explained, during a fight between defendant and somebody else in the parking lot, "somehow I got hit or elbowed or something in the nose, and then I fell to the ground."
Police officers were unable to locate defendant that night and tried repeatedly to find him over time. Officers eventually obtained an arrest warrant, and Black located and arrested defendant about three months after the July parking-lot incident. Defendant asked what the charges were, and Black told him that he was under arrest for fourth-degree assault, "a domestic violence case." Defendant then told Black that, regarding what had happened in July, "there's no way that *** anybody would believe strippers and pimps that saw the incident." He claimed that some gang members had seen defendant and M arguing, became upset with him, and he ran from the scene. Defendant did not explain how M had sustained her injuries. Another officer, Ganci, transported defendant to jail.
At trial, on direct examination, Ganci had testified that on the way to the jail, defendant explained to Ganci that, "if he hit [M] that night ***, that three months later when myself and Officer Black found him, that [M] wouldn't be alive. She'd be dead."
During cross-examination of Ganci, defense counsel asked questions about the officer's training and experience with domestic-violence cases. A protracted exchange ensued:
"Q. In your experience with these types of situations, are they-tend to be isolated incidents or does there tend to be a pattern that tends to go along with that?
*271 "A. What do you mean by that?
"Q. If someone is involved in domestic violence incidents, maybe a victim and a perpetrator, does it tend to be a single isolated incident or can there tend to be patterns and things like that, that go along with it?
"A. So you mean by 'patterns,' what are you specifically talking about?
"Q. Continued abuse, abused again.
"* * * * *
"Q. In your experience-
"* * * * *
"Q. -when you see domestic violence situations, do they tend to continue over periods of time?
"A. Sometimes.
"Q. And, you know, if someone is in one of these situations, that's a serious domestic violence situation, a period of three months can be a long period for someone in one of those situations?
"A. I've seen-I've seen longer. It's really case-specific with certain people, because a lot of people say, 'Hey, this person loves me,' right?
"* * * * *
"Q. So in your experience, can these things escalate over time?
"A. They can.
"Q. Can they get very serious over time?
"A. They can. And they could also dwell and dwindle ***
"Q. So one-let me just kind of get to where we're going here.
"One of the statements you said [defendant] made was that if he had hit [M], three months later she would be dead.
"A. Yes.
"Q. Have you seen domestic violence situations that escalate in that type of manner where it starts with *272 maybe a physical assault and leads to something far more serious?
"A. So I've never been on one specific case where that's happened, no.
"Q. Have you heard of situations like that happening?
"A. Where somebody died?
"Q. Yes.
"A. Yes. There was one in Hillsboro where two-
"Q. And it was part of domestic violence?
"A. -two folks-I'm assuming so. I don't know.
"Q. And these things can get to that level, correct?
"A. Of course."
*673 After that exchange, the jury was excused and the state argued to the trial court that defendant was "trying to insinuate that this wasn't necessarily a larger pattern of abuse." The state informed the court that M had told Black that defendant had "slapped her in the past, but nothing further." The state argued that, through the cross-examination quoted above, defendant had opened the door to the victim's statement about that previous slapping incident.
Defendant disagreed with the prosecutor's characterization of the point of his questioning. He contended that the state had "brought out the statement that [defendant] said, that if he had hit [M], three months later she would be dead, to try to insinuate something about him having hit her." Defendant explained that his questions of Ganci sought to establish "whether or not there was another meaning behind that statement and whether or not, in general regarding domestic violence, these kinds of situations could occur." He expressly denied that any "of the questioning was specific to [defendant's] situation."
The trial court agreed with the state and explained to defense counsel that, having asked "questions that are essentially to elicit the meaning behind statements made by your client, at that point, you've opened the door to other evidence regarding potential meaning ***." Defense counsel remonstrated that he had not "insinuated that [defendant]
*273 hasn't had any prior instances of domestic violence" and argued that his line of questioning "was solely based on generally, whether or not, in a situation where [defendant] made a statement to the police, whether or not that was otherwise explainable." The court did not change its ruling, stating that "the defense opened the door regarding this" because it suggested "that this was somehow an isolated incident, and that this would not otherwise have been a relationship that involved domestic violence." Accordingly, the court explained that it would allow the state to recall Black to testify about the victim's statement that defendant slapped her on a previous occasion.[2]
Black was recalled and testified that, when he spoke with M in July 2015, he had asked whether "it had become physical between her and the defendant." He further testified that M initially responded, "never," but then said "that she had been slapped by the defendant previously, but nothing further." The jury found defendant guilty of assault and the court entered a judgment of conviction.
On appeal, defendant argues that the trial court erred by admitting the evidence that M told Black that defendant had previously slapped her. Defendant contends that the trial court admitted that evidence under "the curative admissibility rule." Under that doctrine, "where one party offers inadmissible evidence, which is received, the opponent may then offer similar facts whose only claim to admission is that they negat[e] or explain or counter-balance the prior inadmissible evidence, presumably upon the same fact, subject matter or issue." Wynn v. Sundquist , 259 Or. 125, 136, 485 P.2d 1085 (1971). Here, defendant argues, the evidence was not admissible under the curative-admissibility doctrine for three reasons. First, defendant contends that his *274 own cross-examination of Ganci about the officer's experience with domestic-violence cases "was not inadmissible." Second, defendant contends that M's statement about the prior slapping incident did not serve to rebut defendant's cross-examination of Ganci, which defendant argues was not meant to imply that defendant had never physically abused M. Accordingly, defendant concludes, his questioning of Ganci did not open the door to evidence of prior abuse. Third, defendant asserts that evidence will be admitted under the curative-admissibility doctrine only when that is necessary to prevent *674 unfairness; he contends that admitting the evidence was not necessary for that purpose in this case.
In response, the state asserts that the court did not admit the evidence under the curative-admissibility doctrine, which relates specifically to countering inadmissible evidence, but pursuant to a related principle that more generally "allows admission of a defendant's prior acts if they become relevant to rebut a misleading suggestion that a defendant has injected into the case." The state contends that the trial court did not err in concluding that defendant's cross-examination of Ganci had "invited the jury to infer that defendant did not commit the charged assault because, if he had, there would be a broader pattern of violence in defendant's relationship with the victim." Because the evidence about defendant's previous assault of the victim "directly rebutted that inference," the state argues, "the trial court did not err in concluding that defendant's cross-examination opened the door to it." The state also notes that defendant did not argue to the trial court that the evidence was not admissible unless it was necessary to avoid unfairness.
We begin our analysis by observing that the state is correct that the trial court's ruling was not premised on defendant's cross-examination of Ganci having elicited inadmissible testimony. Accordingly, the "curative admissibility" doctrine does not govern the admissibility of the prior bad act evidence in this case. Instead, the question is more generally whether defendant's cross-examination of Ganci opened the door to that evidence, which the state contends was admissible to counter or impeach the evidence that *275 defendant had elicited. See, e.g. , State v. Grey , 175 Or. App. 235, 250, 28 P.3d 1195 (2001), rev. den. , 333 Or. 463, 42 P.3d 1245 (2002) (evidence of a defendant's prior bad act that otherwise would be inadmissible under OEC 404(3) may be admissible under that rule for the noncharacter purpose of impeaching the defendant's testimony).
We turn to that question. After defendant was arrested, he said to Ganci that, if he had hit M three months earlier, she would have been dead by the time he was arrested. In cross-examining Ganci, defendant attempted to explain away that statement by eliciting testimony that domestic violence typically involves a repeated pattern of abuse. It is apparent that defendant hoped to create the impression that, conversely, it is rare for a person to hit a domestic partner only once-thus laying the groundwork for an argument that defendant was simply pointing out to Ganci that, if he were a person who had engaged in domestic violence three months earlier, that abuse would have escalated by the time he was arrested. Such an argument necessarily would be premised on the notion that defendant had not been in a domestically violent relationship with M, that is, that defendant had not repeatedly abused M. Thus, the trial court concluded, defendant's cross-examination of Ganci was aimed at suggesting "that this was somehow an isolated incident, and that this would not otherwise have been a relationship that involved domestic violence."
The trial court did not err by rejecting defendant's contrary assertion regarding the purpose of his cross-examination of Ganci. Below, defendant asserted that his questioning was meant to establish "whether or not there was another meaning behind [defendant's] statement and whether or not, in general regarding domestic violence, these kinds of situations could occur." For at least three reasons, the trial court was not required to interpret the cross-examination that way. First, defendant's line of questioning, quoted above, was specifically tied to the timeline in this case, given defendant's references to a three-month period-the amount of time that passed between the assault in this case and defendant's arrest-and his question about whether that is "a long period" for somebody involved in domestic violence. Second, it is even less *276 likely that defendant's cross-examination of Ganci related to purely abstract questions about typical domestic-violence situations when one recalls that the questions were meant to lend context to defendant's assertion that if he had hit this victim three months earlier, she would have died in the interim. Finally, if the questions had really been aimed only at discussing domestic-violence patterns generally-without *675 implying anything in particular about defendant's and M's circumstances-there would have been little reason for defense counsel to ask them. The trial court did not err by concluding that defendant's cross-examination of Ganci was meant to (1) create the impression that it is unusual for a single incident of domestic violence to occur and that, had defendant hit M, there would have been additional incidents of abuse and (2) suggest that such a message is what defendant meant to convey when he said that, if he had hit M three months earlier, she already would have been dead.[3]
The next question is whether the court erred in determining that that cross-examination opened the door to admission of evidence that defendant had previously slapped M. The court did not err. Once defendant sought to imply that he had not engaged in the type of repeated abuse that he contends would be typical in a domestic-violence situation, the state could offer evidence demonstrating that, in fact, defendant had assaulted M more than once. See State v. Oliver , 275 Or. App. 552, 555, 365 P.3d 151 (2015) ("Once defendant testified that he was a 'caring man' who would not use force to harm another person, the evidence of defendant's prior acts *** became probative to impeach that testimony."); Grey , 175 Or. App. at 250, 28 P.3d 1195 (evidence of the defendant's prior arrests in the United States was admissible to counter her argument that her unfamiliarity with police practices in this country explained her reaction when officers handcuffed another person). This is not a case like State v. Renly , 111 Or. App. 453, 827 P.2d 1345 (1992), on *277 which defendant relies. In Renly , the trial court concluded that the defendant's own evidence opened the door to certain prior bad acts evidence; we held that the ruling was error because the bad-acts evidence "did not in any way tend to negate, explain or counterbalance any misleading or unfair impression that defendant's evidence could possibly have caused the jury" and, therefore, "there was no 'open door' to its admissibility." Id. at 458, 827 P.2d 1345. Here, evidence that defendant previously had slapped M did tend to negate or counterbalance the impression he tried to create through his cross-examination of Ganci.
Finally, defendant asserts that courts have tended to apply the curative-admissibility doctrine only when admitting the curative evidence is necessary to prevent unfairness or misleading the jury on a significant issue. See generally State v. Craine , 271 Or. App. 101, 111, 349 P.3d 628 (2015) (citing Laird C. Kirkpatrick, Oregon Evidence § 402.04, 172 (5th ed. 2007), for that "necessary to prevent unfairness" principle). That argument is both inapt and unpreserved. Again, the evidence in this case was not admitted under the specific curative-admissibility doctrine to which the cited "necessary to prevent unfairness" principle applies. Moreover, defendant did not argue below that the evidence was inadmissible because it was not needed to prevent unfairness. And to the extent that defendant can be understood to argue more generally that the probative value of the evidence is substantially outweighed by the danger of unfair prejudice, that is not an argument that defendant made below, either. Accordingly, this argument, too, presents no basis for reversal of the trial court's judgment.
Affirmed.

The new assault conviction is reflected in the judgment in Washington County case number D153348M. The judgments based on defendant's violation of his probation are in Washington County case numbers D131456M and D142437M. Defendant challenges those probation-violation judgments only on the ground that they are based on the assault conviction that he challenges on appeal. Our rejection of defendant's challenge to the assault conviction also defeats his challenges to the probation-violation judgments.

At that point, defense counsel requested a limiting instruction telling the jurors that they should not "consider that for the truth of what was said and whether or not she was slapped." The court agreed, and it instructed the jury that evidence about "a prior allegation of slapping by the defendant" could be considered only for the fact "that the statement was made" and not "for whether or not the defendant committed the alleged conduct in the charge alleged in this case." On appeal, the state does not contend that the limiting instruction would render any error in admitting the prior-bad-act evidence harmless. Because we conclude that the trial court did not err in admitting the evidence, we need not reach the harmlessness question.

On appeal, defendant takes a somewhat different approach. He no longer contends that his cross-examination of Ganci was meant only to discuss domestic violence in the abstract. Instead, he asserts that his questioning "attempted to make the point that he and [M] had not fallen into the most detrimental type of domestic-violence relationship: one in which the victim is eventually killed by his or her abuser." (Emphasis added.) Because defendant did not make that argument below, we do not consider it here.