Argued and submitted January 13, order of circuit court affirmed April 21, 2022

# STATE OF OREGON,
*Appellant,*

*v.*

# BILLY LEE OATNEY, JR.,
*Respondent.*

## (CC 18CR70058) (SC S068761)

508 P3d 482

Defendant had been convicted of aggravated murder and sentenced to death. During its initial investigation of the murder, the state gave defendant contractual use and derivative use immunity in exchange for providing information about the circumstances of the murder. The state then shared part of defendant's immunized statement with an associate, Johnston. As a result, Johnston provided the state with additional information about the murder, pleaded guilty to the crime, and testified against defendant in his first trial for aggravated murder. Following defendant's conviction and sentencing, he obtained post-conviction relief, and a remand for further proceedings, on the ground that his trial counsel had been inadequate for failing to move to suppress Johnston's statements and testimony, which had derived from defendant's immunized statement. At defendant's retrial, the trial court entered a pretrial order that, among other things, precluded the state from calling Johnston to present testimony that violates defendant's immunity agreement if defense counsel makes certain statements and arguments within the limits of the law and evidence presented. The state appealed the trial court's pretrial order under ORS 138.045, which permits the state to directly appeal pretrial orders suppressing evidence when the defendant is charged with murder or aggravated murder. *Held*: (1) ORS 138.045 permitted the state's appeal, because the challenged aspect of the order precluded the state from calling Johnston as a witness in certain circumstances; and (2) the trial court did not err in ruling that, within the law and evidence presented, defense counsel may argue in opening or closing statements that Johnston or someone other than defendant had committed the crime or that the state has not proved beyond a reasonable doubt that defendant committed the crime, without opening the door to permitting the state to call Johnston to present testimony that violates defendant's immunity agreement.

The order of the circuit court is affirmed.

On appeal from an order of the Washington County Circuit Court under ORS 138.045(2) and ORAP 12.07.*

Timothy A. Sylwester, Assistant Attorney General, Salem, argued the cause and filed the briefs for appellant. Also on

_____

\* Beth L. Roberts, Judge.

the briefs were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Richard L. Wolf, Richard L. Wolf PC, Portland, argued the cause and filed the briefs for respondent.

Before Walters, Chief Justice, and Balmer, Flynn, Nelson, and Garrett, Justices, and Linder and Landau, Senior Judges, Justices pro tempore.**

BALMER, J.

The order of the circuit court is affirmed.

_____

** Duncan and DeHoog, JJ., did not participate in the consideration or decision of this case.

**BALMER, J.**

Defendant was convicted of aggravated murder and sentenced to death. *State v. Oatney*, 335 Or 276, 66 P3d 475 (2003), *cert den*, 540 US 1151 (2004) (*Oatney I*). During its initial investigation of the murder, the state gave defendant contractual use and derivative use immunity in exchange for providing information about the circumstances of the murder. The state then shared part of defendant's immunized statement with an associate, Johnston. As a result, Johnston provided the state with additional information about the murder, pleaded guilty to the crime, and testified against defendant in his first trial for aggravated murder. Following defendant's conviction and sentencing, and this court's affirmance of the judgment of conviction and sentence in *Oatney I*, he obtained post-conviction relief on the ground that his trial counsel had been inadequate for failing to move to suppress Johnston's statements and testimony, which had derived from defendant's immunized statement. The post-conviction court remanded the case for further proceedings.

The state initiated retrial proceedings against defendant, and the state now appeals a pretrial order. Among other things, that order precludes the state in defendant's retrial from calling "Johnston to present testimony that violates the immunity agreement of Defendant," even if, "[w]ithin the limits of the law and the evidence presented," defense counsel represents in opening statements that the evidence will show that Johnston or someone other than defendant committed the crime or argues in closing that the state has not proved beyond a reasonable doubt that defendant committed the crime. Defendant raises a cross-assignment of error, arguing that, if we reverse on direct appeal, we should also conclude that the trial court erred in ruling that defendant would open the door to Johnston's testimony by presenting evidence of Johnston's judgment of conviction. For the reasons that follow, we conclude that the trial court did not err in precluding the state from calling Johnston under the circumstances described in the order and, for that reason, do not address defendant's cross-assignment. Accordingly, we affirm.

## I.  BACKGROUND

We take the historical facts from this court's decision on direct review, *Oatney I*, 335 Or 276, and the Court of Appeals' post-conviction decisions, *Oatney v. Premo*, 275 Or App 185, 369 P3d 387 (2015), *rev den*, 359 Or 847 (2016) (*Oatney II*), and *Oatney v. Kelly*, 288 Or App 550, 407 P3d 958 (2017), *rev den*, 362 Or 508 (2018) (*Oatney III*).

The victim was murdered in 1996. Defendant was ultimately charged with multiple counts of aggravated murder, and Johnston was charged with one count of aggravated murder. Johnston pleaded guilty, and, in exchange for his cooperation and testimony, the state agreed that it would not seek the death penalty in his case. At defendant's original trial, Johnston and defendant both testified. According to Johnston, he and defendant had together murdered the victim in defendant's apartment. *Oatney I*, 335 Or at 280. According to defendant, Johnston alone had murdered the victim while defendant was away from the apartment, and defendant helped Johnston cover up the crime out of fear of being implicated in a murder that had occurred in his apartment. *Id.* A jury convicted defendant and sentenced him to death. Thereafter, the court sentenced Johnston to life in prison without the possibility of parole. On direct review, this court affirmed defendant's convictions and sentence of death. *Id.* at 278.

Defendant sought post-conviction relief, contending that his trial counsel had been inadequate and ineffective "by failing to seek suppression of statements and testimony derived from a statement that [defendant] made about the murder in exchange for a promise of immunity from the district attorney."[1] *Oatney II*, 275 Or App at 187. The post-conviction court denied relief, and defendant appealed.

The Court of Appeals recounted the circumstances that gave rise to defendant's immunized statement. Defendant's attorney had arranged for defendant "to disclose what he knew to police and the district attorney on October 23,

_____
[1] To avoid confusion, we refer to "defendant" and "the state" throughout this opinion regardless of their precise designations in the various proceedings that are recounted.

1996, in exchange for a promise that his statement and derivative evidence would not be used against him." *Id.* at 197. Before making the statement, the district attorney promised defendant that "'anything you say during the course of this interview' and 'any information that we derive from what you tell us' 'cannot ever be used against you.'" *Id.* The district attorney "reconfirmed his original promise" at the end of the interview. *Id.* at 213.

In that immunized statement, defendant indicated that "Johnston had murdered the victim" and had "stolen several items from her apartment." *Id.* at 197. Defendant also told the prosecutor that, the day after the murder, he had "helped Johnston dispose of the victim's clothing" along with the items stolen from her apartment. *Id.* After defendant had made the "bulk of the statement," the detectives who were present requested defendant's "permission to play" a recording of it for Johnston, and defendant agreed. *Id.* at 197-98.

"Until that point, despite repeated attempts by the police to get information about the murder from Johnston, Johnston had refused to speak to the police about the murder ***." *Id.* at 198. "Immediately after the detectives played part of [defendant's] statement—in which, as noted above, [defendant] said that Johnston had committed the murder alone—Johnston's face turned beet red, and he clenched and shook his fists. He then immediately asserted that [defendant] had committed the crime." *Id.* During subsequent interviews, Johnston eventually asserted that "he and [defendant] had committed the crime together," and, at defendant's trial, Johnston gave similar testimony. *Id.*

Against that factual backdrop, the Court of Appeals concluded that defendant, who had voluntarily waived his right against self-incrimination, was entitled to use and derivative use immunity, which was governed by contract principles.[2] *Id.* at 203-04, 203 n 1. Applying those principles, the court concluded that

---

[2] *See State v. Soriano*, 68 Or App 642, 644 n 3, 684 P2d 1220, *aff'd and opinion adopted*, 298 Or 392, 693 P2d 26 (1984) ("There are generally three kinds of testimonial immunity. They are: (1) transactional immunity, under which the witness is immune from prosecution for any offense to which the immunized

"the immunity agreement unambiguously provided that, in exchange for [defendant's] information about the murder, the district attorney would not use against [defendant] (1) [defendant's] statement itself, (2) any physical evidence discovered as a result of [defendant's] statement, or (3) information discovered as a result of follow-up interviews, including the interview of Johnston."

*Id.* at 209.

In determining whether Johnston's statements derived from defendant's immunized statement, the Court of Appeals essentially analogized defendant's contractual immunity to the use and derivative use immunity described in the United States Supreme Court's decision in *Kastigar v. United States*, 406 US 441, 92 S Ct 1653, 32 L Ed 2d 212 (1972). *Oatney II*, 275 Or App at 209-10, 217; *see also Aiken v. United States*, 956 A2d 33, 46 (DC 2008) (*Aiken I*) ("[T]he requirements of *Kastigar* have been applied to information given by defendants to government agents in exchange for informal (*i.e.*, non-statutory) promises of immunity."). In *Kastigar*, the Court held that, in the context of a federal statutory grant of immunity, "immunity from use and derivative use is coextensive with the scope of the [Fifth Amendment] privilege against self-incrimination[.]" 406 US at 453. The Court further held that, in a subsequent prosecution of an individual who has been granted use and derivative use immunity, the burden of proof on the prosecution "is not limited to a negation of taint," but rather "imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." *Id.* at 460.

Consistently with the state's acknowledgement before the post-conviction court, the Court of Appeals reasoned that, had defendant's trial counsel sought before the trial court to exclude Johnston's statements as derivative of defendant's immunized statement, "the state would have had the burden of showing that Johnston's statements and testimony

testimony relates; (2) use and derivative use immunity, under which the witness is not immune from prosecution, but the state may not use the immunized testimony or any of its direct or indirect fruits; and (3) use immunity, under which the state may not use the immunized testimony in a prosecution of the witness, but may use evidence obtained through information contained in the testimony.").

were 'derived from a legitimate source wholly independent of' [defendant's] immunized statement." *Oatney II*, 275 Or App at 217 (quoting *Kastigar*, 406 US at 460). The Court of Appeals further reasoned that "the undisputed evidence is that Johnston made his October 23 statement to the police because of [defendant's] statement"—that is, defendant's statement "caused Johnston to implicate [defendant]" and "to confess his own participation." *Id.* at 218-19. Thus, that court concluded that defendant had proved in the post-conviction proceeding that "Johnston's statements and testimony derived from [defendant's] statement, not from any independent source." *Id.* at 219. Because defendant's "trial counsel [had] failed to exercise reasonable professional skill and judgment in failing to seek suppression of Johnston's statements and testimony," and because that failure prejudiced defendant, the court reversed and remanded the post-conviction court's judgment. *Id.* at 222-23. This court thereafter denied the state's petition for review.

On remand in the post-conviction court, defendant sought to have that court include provisions in its judgment "prohibiting Johnston from testifying for the state on retrial" and excluding (1) "Johnston's testimony at the first trial"; (2) evidence of "all out-of-court statements made by Johnston on or after the date of the state's immunity agreement with [defendant]"; and (3) evidence "obtained or derived from" defendant's immunized statement. *Oatney III*, 288 Or App at 551. The post-conviction court refused to include those provisions, and defendant appealed.

The Court of Appeals affirmed the post-conviction court's judgment, reasoning that, if the post-conviction court properly had granted relief in the first instance, it would not have addressed the admissibility of evidence on retrial. The court explained that "the admissibility of evidence on retrial of the charges against [defendant] was not, and could not have been, a subject of post-conviction relief" and that, "[t]o the extent that the grant of post-conviction relief could affect the admissibility of evidence on retrial under the doctrines of issue and claim preclusion, as [defendant] contends, that is an issue that [defendant] will have to raise with the trial court that presides over the retrial." *Id.* at 552.

After defendant's case returned to the trial court for retrial, the parties began litigating a variety of evidentiary issues.[3] In the process of resolving some of those issues, the trial court held "*Kastigar* hearings"—that is, as pertinent here, hearings held for the purpose of permitting the state to prove that all the evidence that it proposed to use at trial is wholly independent of defendant's immunized statement. *See United States v. North*, 910 F2d 843, 854 (*North I*), *superseded in part on other grounds on reh'g*, 920 F2d 940 (DC Cir 1990) (*North II*), *cert den*, 500 US 941 (1991) (explaining that *Kastigar* hearings are conducted "for the purpose of allowing the government to demonstrate that it obtained all of the evidence it proposes to use from sources independent of the compelled testimony"). *Kastigar* hearings may be held "pre-trial, post-trial, [or] mid-trial (as evidence is offered), or [a court] may employ some combination of these methods"; however, pretrial hearings are "the most common choice." *Id*.

Before the hearing concerning the evidence that the state intended to offer in its case-in-chief, the trial court ordered that, as to "evidence obtained after [defendant's] October 23, 1996[,] immunized statement," the state "has the burden to provide independent sources of information not derived from [defendant's] statement." The state did not seek to demonstrate that Johnston could be called to testify in the retrial consistently with that standard, but asserted that the defense could "open[] the door for some of the original evidence," including Johnston's testimony.

Thereafter, defendant filed a motion seeking to admit Johnston's judgment of conviction for murder and the part

---

[3] Also, after defendant's case returned to the trial court, the legislature enacted Senate Bill (SB) 1013 (2019). That legislation narrowed the scope of the offense of aggravated murder. *See State v. Bartol*, 368 Or 598, 601-05, 496 P3d 1013 (2021) (describing effect of SB 1013). The legislation also created "a new category of murder, 'murder in the first degree'" and "provided a maximum sentence of life imprisonment without the possibility of parole for 'murder in the first degree.'" *Id.* at 601. As a result, the state amended the indictment against defendant to allege the counts of aggravated murder as counts of first-degree murder under ORS 163.107. *See id.* at 605 (noting that the changes to the definition of "aggravated murder" effectuated by SB 1013 apply to crimes committed before its effective date but that are subject to sentencing proceedings that occur on or after September 29, 2019). Thus, defendant is no longer being tried for aggravated murder, and he is no longer subject to the death penalty, if convicted.

of his indictment necessary to explain it, without opening the door to "any type of rebuttal evidence stemming from [defendant's] immunized statement or evidence derived from [defendant's] immunized statement or from *** Johnston himself." The state agreed that those "documents are relevant and admissible for [defendant's] defense," but argued that, because defendant "seeks to make selective use of suppressed evidence and lead the jury to inaccurate inferences," that "evidence would clearly open the door to suppressed and 'tainted' evidence." The trial court denied the motion without explanation.

Over a year later, defendant filed a supplemental motion, raising many of the same issues as in the original motion. The state urged the court to deny the supplemental motion as an attempt to relitigate previously resolved issues. The hearings that followed focused on what actions would open the door to permit the state to call Johnston.

After the trial court asked the state to confirm that Johnston would not be called as part of the state's case-in-chief, the state acknowledged that Johnston would be part of its case, but that, as to "his involvement in the actual murder, we're not going there." However, the state asserted that, "if there's anything at all, any argument, any questioning, any evidence that tends to shift this toward *** Johnston," that would open the door to calling Johnston to testify because, at that point, his testimony would no longer be derived from defendant's immunized statement. The state reasoned that, if defendant took the position on retrial that Johnston committed the murder, Johnston would be entitled to feel the "indignation" and motivation to "set the record straight" that he originally felt and that Johnston's new motivation would create a "clean slate," thereby permitting the state to call him "to talk about what happened." In other words, the state contended that, if Johnston were motivated to testify based on something that occurred at the retrial, he would have a new motivation that would permit his testimony without violating the immunity agreement. The gist of the state's argument was that that new motivation would make Johnston's testimony at the retrial "independent" of defendant's immunized statements.

Ultimately, the trial court reiterated its prior ruling denying defendant's motion to admit Johnston's judgment of conviction. The court explained that "[a]ny admission of that judgment of conviction would open the door and allow the State to call *** Johnston to explain that conviction." After the hearing, the court entered an order explaining, among other things, the actions that would or would not open the door and permit the state to call Johnston. The order provides, in part:

"The history of the case is well known to the parties, as is the [post-conviction] ruling which brings this case back to trial after 23 years. The ruling from the Court of Appeals gives the court clear guidance on the use of any statements of witness Johnston that were made as a result of exposure to [defendant's] October 23, 1996[,] immunized statement.

"**The Court heard the arguments of the parties on this issue and therefore the court orders the following:**

"1.   The state may not use the prior testimony of *** Johnston received during [defendant's original] trial in Washington County Case C973456CR because that testimony was derived from Defendant's October 23, 1996[,] immunized statement.

"2.   Testimony from the Defendant in [the present case] that *** Johnston committed the crime will open the door, allowing the state to call *** Johnston as a rebuttal witness.

"3.   Within the limits of the law and the evidence presented, Defense Counsel may offer in their opening that the evidence will prove that *** Johnston or someone other than the Defendant committed the crime and may argue in closings that the state has not proved beyond a reasonable doubt that Defendant committed the crime. Such statements by the attorneys shall not open the door to the state to call *** Johnston to present testimony that violates the immunity agreement of Defendant.

"4.   Defendant may not present any evidence derived from Defendant's October 23, 1996[,] immunized statement or evidence derived from that statement that suggests *** Johnston committed the murder of [the victim] without opening the door to the state calling *** Johnston in this present case.

"5.    Both parties may present any evidence that supports their theory of the case, pursuant to the prior rulings of the court."

(Boldface in original.)

        At that point, the state filed an offer of proof concerning Johnston's potential testimony. That offer stated, "Counsel for the State has spoken to *** Johnston and believes that should he testify, *** Johnston would articulate his first-hand knowledge that the defendant directly participated in causing the death of [the victim]."[4] This interlocutory state's appeal of the trial court's pretrial order followed.

## II.   ANALYSIS

### A.   *Appealability*

        This direct appeal derives from statutes that permit the state to appeal certain pretrial orders. *See* ORS 138.045(1)(d) (providing that "[t]he state may take an appeal from the circuit court *** to the Court of Appeals from[,]" among other things, "[a]n order made prior to trial suppressing evidence"); ORS 138.045(2) (providing that, "[n]otwithstanding subsection (1) of this section, when the state chooses to appeal an order described in subsection [(1)(d)] of this section, the state shall take the appeal to the Supreme Court if the defendant is charged with murder or aggravated murder"); *State v. Jackson*, 368 Or 705, 715, 498 P3d 788 (2021) (concluding that "the phrase 'suppressing evidence,' as it is used in ORS 138.045(1)(d), includes orders that exclude evidence on any grounds").

        In this case, the trial court's order does several things. Paragraph (1) precludes the state from using Johnston's testimony from defendant's original trial. Paragraphs (2) and (4) preclude defendant from testifying in the retrial that Johnston committed the crime or from presenting evidence

---

[4] The state's offer of proof did not address (1) whether Johnston's motivation to testify would be affected by defense arguments implicating him in the murder at defendant's retrial; or (2) whether Johnston's motivation to testify would be unaffected by his prior exposure to defendant's immunized statements. Because we reject the state's contentions on the merits of this appeal and uphold the trial court's order, we need not consider how the absence of an offer of proof as to those propositions affects this appeal.

that derived from his immunized statement, including evidence suggesting that Johnston committed the murder, without opening the door to the state calling Johnston to testify. Paragraph (5) permits the parties to "present any evidence that supports their theory of the case, pursuant to the prior rulings of the court." And paragraph (3) provides that defense *arguments* made "[w]ithin the limits of the law and the evidence presented" about what the evidence demonstrates—including arguments that the evidence demonstrates that Johnston or someone other than defendant committed the murder or that the state has not proved beyond a reasonable doubt that defendant committed the crime—will *not* open the door to the state to call Johnston "to present testimony that violates the immunity agreement."

In this appeal, the state has not challenged paragraph (1).[5] And defendant did not seek to cross-appeal the trial court's rulings in paragraphs (2) and (4).[6] Thus, the state's appeal concerns only paragraph (3).

When viewed in the context of the order as a whole, paragraph (3) effectively precludes the state from calling Johnston to testify in a particular set of circumstances. As noted, the court's rulings in paragraphs (2) and (4) *permit* the state to call Johnston to testify if defendant presents certain *evidence* suggesting that Johnston committed the crime (*i.e.*, if defendant testifies that Johnston committed the crime or presents evidence derived from defendant's immunized statement, including evidence that Johnston committed the murder). Paragraph (3), by contrast, does *not* permit the state to call Johnston to present testimony that

---

[5] In its brief, the state acknowledges that, "for purposes of this appeal, *** it may not present evidence at the retrial in this case of the statements that Johnston made to investigators after the police disclosed defendant's immunized statement to him or that he thereafter made during his testimony during the previous trial—that is, the state agrees that that evidence generally is inadmissible on retrial."

[6] *See* ORS 138.035(5) (permitting a defendant to "cross-appeal when the state appeals pursuant to ORS 138.045(1)(d)"); ORS 138.105(11)(a) ("On a defendant's cross-appeal under ORS 138.035(5), the appellate court may, in its discretion, limit review to any decision by the trial court that is inextricably linked, either factually or legally, to the state's appeal."); *see also* ORS 138.105(11)(b) ("The failure to file a cross-appeal under ORS 138.035 (5) does not waive a defendant's right to assign error to a particular ruling of the trial court on appeal from a judgment.").

violates the immunity agreement if (1) the defense *argues* in opening statements that "the evidence will prove that \*\*\* Johnston or someone other than the Defendant committed the crime," or *argues* in closing that "the state has not proved beyond a reasonable doubt that Defendant committed the crime"; and (2) those arguments are based on the evidence in the record that, consistently with *Kastigar*, the court has already determined is wholly independent of defendant's immunized statement. Put differently, paragraph (3) provides that such arguments by defendant do not open the door to permit the state to call Johnston. Because the court's order precludes the state from calling Johnston to testify under those circumstances, it is appealable pursuant to ORS 138.045.

Although essentially acknowledging that the trial court's order is appealable under that statute, defendant, nevertheless, has filed a motion for a summary determination of appealability in this court, contending that ORS 19.235 permits this court to dismiss appeals for reasons other than the appealability of the decision. *See* ORS 19.235(3) (providing, in part, that, "[w]hen a party by motion \*\*\* raises the issue whether the decision is appealable, the appellate court may make a summary determination of the appealability of the decision"). Specifically, in his motion, defendant contends that we should dismiss this appeal for reasons including that the state failed to "timely and properly" preserve the issues that it raises, and that "the doctrines of issue and claim preclusion as well as law of the case" compel dismissal. Those contentions, however, relate to the reviewability of the state's contentions rather than the appealability of the trial court's order. Because we ultimately reject the state's arguments on appeal and affirm the trial court's order, we need not address defendant's contention that ORS 19.235 permits an appellate court to dismiss an appeal for reasons other than the appealability of the decision. Accordingly, we deny defendant's motion.

B.   *State's Arguments on the Merits*

This case comes to us in an unusual procedural posture. At issue is a single ruling in a pretrial order that

precludes the state from calling a witness if defense counsel makes certain statements and arguments within the law and evidence presented. By necessity, it is a ruling that is made without the benefit of an evidentiary record and that may be revisited as the trial proceeds and in the precise context of the record that ultimately develops. As a result, the issues on appeal have an abstract quality, and the state's arguments are based on assumptions about what the evidence may be.

In its single assignment of error challenging paragraph (3) of the trial court's order, the state contends that "[t]he trial court erred when it precluded the state from calling * * * Johnston as a witness during trial unless defendant first presents testimony or other evidence that Johnston alone killed the victim." Essentially reiterating the arguments that it made below, the state raises two contentions on appeal. First, the state contends that, "if defendant chooses to argue to the jury that Johnston murdered the victim acting alone, that would be sufficient[ly] misleading to open the door to the state rebutting that accusation by presenting, through Johnston, contrary evidence that defendant knows is being excluded." Second, the state contends that such arguments would permit the state to call Johnston by "break[ing] the causal chain between Johnston's exposure to the immunized statement in 1996 and his decision to testify at the retrial."

Turning first to the state's contention that the defense arguments permitted by paragraph (3) would mislead the trier of fact and open the door to permit the state to call Johnston to testify, the state argues that,

"[a]s a general matter, it is well established that when certain evidence is excluded but the defendant, for his or her own tactical purposes, nonetheless chooses to present either evidence or argument that provides a misleading picture to [the] trier of fact, and thereby makes that excluded evidence relevant as rebuttal to correct that false impression, that tactical choice may 'open the door' to [the] state's presentation of the excluded evidence."

Further, the state asserts that, "[i]n such circumstances, the question for purposes of this 'open the door' rule is whether,

given the nature of the excluded evidence, the defendant's tactical choice created an incomplete, misleading, or unfair impression for the jury and, if so, whether admission of the otherwise excluded evidence is appropriate to rebut that false impression."

In support of that argument, the state points to cases like *State v. Miranda*, 309 Or 121, 128, 786 P2d 155, *cert den*, 498 US 879 (1990), in which this court reasoned that "[a] defendant's own inquiry on direct examination into the contents of otherwise inadmissible statements opens the door to further inquiry on cross-examination relating to those same statements." *See also United States v. Robinson*, 485 US 25, 32, 108 S Ct 864, 99 L Ed 2d 23 (1988) (reasoning that, where defense counsel in closing argument remarked that the government did not allow the defendant to explain his side of the story, the prosecutor's reference to defendant's opportunity to have testified was a "fair response"); *State v. Apodaca*, 291 Or App 268, 269, 420 P3d 670 (2018) (concluding that the trial court did not err in admitting prior bad acts evidence to "counter evidence that defendant himself elicited, which could have suggested to the jury that he had not previously assaulted the victim").

This case is distinguishable from *Miranda*, in which the defendant's use of *inadmissible evidence* opened the door to the state's use of that *inadmissible evidence*. Here, paragraph (3) contemplates a different set of circumstances in which defense *arguments* about what the evidence shows (*i.e.*, that the evidence will show that Johnston or someone other than defendant committed the crime, or that the state has not proved beyond a reasonable doubt that defendant committed the crime) are circumscribed by and based on the evidence in the retrial proceeding that the trial court will have already determined is *admissible* and wholly independent of defendant's immunized statement.

Arguments that urge the jury to draw legitimate inferences based on admissible evidence are generally acceptable; conversely, arguments that go beyond the admissible evidence generally are not. *See State v. Sperou*, 365 Or 121, 134, 442 P3d 581 (2019) (explaining that "statements by attorneys at trial are generally required to be limited to the

issues and evidence presented"); *Cler v. Providence Health System-Oregon*, 349 Or 481, 487-88, 245 P3d 642 (2010) (explaining that, in presenting closing arguments, counsel has "a large degree of freedom to comment on the evidence submitted and urge the jury to draw any and all legitimate inferences from that evidence[,]" but counsel may not make "statements of facts outside the range of evidence" (internal quotation marks omitted)); *see also* RPC 3.4(e) (providing, in part, that a lawyer shall not, "in trial, allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence"). Jurors are also typically instructed to base their verdict on evidence and not the statements of attorneys. *See State v. Black*, 364 Or 579, 597 n 9, 437 P3d 1121 (2019) (noting that "[w]hat a party says in closing argument is not evidence, and the jury was instructed on that point"); *see also* UCrJI 1005 (instructing jurors," to "[b]ase [their] verdict on the evidence and these instructions" and that "[t]he lawyers' statements and arguments are not evidence").

The state's broader assertion that the defense arguments permitted by paragraph (3) could create an incomplete, misleading, or unfair impression finds no traction. Permissible argument circumscribed by the admissible, nonderivative evidence in the retrial proceeding, and the legitimate inferences that may be drawn from that evidence, permit defendant to litigate his theory of the case, as he is entitled to do. To the extent that the state is prevented from rebutting the inferences that defense counsel may ask the jury to draw by calling Johnston to testify in violation of the immunity agreement, any potential prejudice to the state is a result of the state's initial decision to grant defendant use and derivative use immunity. Having made that decision, it would not be appropriate to permit the state to effectively breach the agreement by calling Johnston to present testimony that violates it, which is what paragraph (3) prohibits.

For similar reasons, we reject the state's contention that defense arguments suggesting to the jury that "Johnston acted alone" would waive the benefit of defendant's immunity agreement so as to "open the door" to the state calling Johnston to testify. As noted, because defendant was

not compelled to provide to the state the information that he did, his immunity, as the Court of Appeals explained, is contractual in nature. Generally, a party to a contract may waive the performance of a provision that is for its benefit. *Cf. Bennett v. Farmers Ins. Co.*, 332 Or 138, 156, 26 P3d 785 (2001) ("A party to a written contract may waive a provision of that contract by conduct or by oral representation."); *see also id.* ("Waiver is the voluntary relinquishment of a known right."). Here, if, as paragraph (3) contemplates, defense counsel's arguments are based on the evidence in the retrial proceeding that the court determines to be admissible and wholly independent of defendant's immunized statement, those arguments will not serve to voluntarily relinquish the protections of defendant's immunity agreement.

Finally, pretrial rulings are often based on "representations and arguments" about what the evidence is expected to demonstrate and that are therefore "hypothetical and abstract." *State v. Pitt*, 352 Or 566, 573, 293 P3d 1002 (2012). "[A]s trial progresses, new circumstances may arise that directly or indirectly alter the admissibility or evidentiary value of certain pieces of evidence." *Id.* As a consequence, the scope of permissible argument may be affected. "Generally, a trial court has broad discretion in determining whether to reconsider its earlier rulings and may revisit a pretrial ruling when events at trial unfold that call for adjustments to that ruling." *State v. Langley*, 363 Or 482, 521, 424 P3d 688 (2018), *adh'd to as modified on recons*, 365 Or 418, 446 P3d 542 (2019), *cert den*, ___ US ___, 141 S Ct 138 (2020) (internal citation omitted). Here, the trial court has already recognized that it may become necessary to revisit its prior rulings as the case progresses, and our decision does not foreclose the trial court from doing so.

At this juncture, then, the success of the state's appeal turns on its alternative contention, *viz.*, that, "[i]f defendant blames the murder entirely on Johnston, that could sever the connection between the immunized statement and Johnston's motive to testify at trial." Relying on *United States v. Allen*, 864 F3d 63 (2d Cir 2017), the state reasons that a witness's testimony can derive from an immunized statement in three ways: "[T]he statement may inform *what* the

witness knows, *whether* the police know about the witness, or *why* the witness chooses to testify." (Emphases in state's brief.) Here, the state asserts that "only the 'why' question is at issue." Specifically, the state argues that, although Johnston "was made aware of *** defendant's immunized statement, [he] has personal knowledge of the facts of the murder independent of [his] exposure" to that statement, and, as a result, the use and derivative use "immunity that defendant was granted does not preclude the state from presenting Johnston's testimony at the retrial, so long as the state can show that his motive to testify does not derive from—[and] is now independent of—his previous exposure to the immunized statement," which "could arise from defense *arguments* at the retrial that place the blame for the murder only on him." (Emphasis in state's brief.) According to the state, the defense arguments permitted by paragraph (3) of the trial court's order would serve to "break the causal chain between Johnston's exposure to the immunized state-ment in 1996 and his decision to testify at the retrial."

Defendant disagrees, asserting that the "question is not 'why' Johnston may be motivated in the retrial to tes-tify against [defendant]," but whether the state can prove, consistently with *Kastigar*, that Johnston's exposure to defendant's immunized statement did not "'shape, alter, or affect'" the information that he seeks to provide. (Quoting *Allen*, 864 F3d at 93.) According to defendant, the state has "never *tried* to meet its burden on this issue" and, "[h]ad it tried, it would have been prevented from doing so by the doctrines of issue and claim preclusion and law of the case." (Emphasis in defendant's brief.) Further, defendant argues that, "[e]ven if those doctrines did not prevent the state from attempting to meet its 'heavy burden,' under *Kastigar*, it could never meet its burden in this case because exposing Johnston to [defendant's] immunized statement *did* 'shape, alter [and] affect the information that [Johnston] provided and that the Government used.'" (Quoting *Allen*, 864 F3d at 93 (emphasis and third and fourth brackets in defendant's brief).) As defendant notes, "'but for' Johnston's exposure to [defendant's] immunized statement, Johnston would *not* have made any statement implicating [defendant]," and "[n]othing, not the passage of time, nor any change of heart

or motivation by Johnston can ever alter that fact or that conclusion of law." (Emphasis in defendant's brief.)

Before turning to the substance of the parties' contentions, we begin by addressing a preliminary matter, which will help clarify the issues presented for our review and our resolution of them. The parties do not dispute that the state gave defendant use and derivative use immunity, or that that immunity was contractual in nature because defendant had not been compelled to provide the information that he did. In *Oatney II*, the Court of Appeals determined that, in the context of the parties' agreement, "derivative use" carried its well-defined legal meaning, and it looked to *Kastigar* as a useful construct for understanding the scope of that immunity. 275 Or App at 209-10, 217. When the case returned to the trial court for retrial, the parties and the trial court also looked to *Kastigar* and its progeny in litigating some of the issues that arose, and, as a result, the trial court held *Kastigar* hearings. By the time of the *Kastigar* hearing concerning the evidence that the state intended to offer in its case-in-chief, the trial court had ordered that, as to evidence obtained after defendant gave his immunized statement, the state "has the burden to provide independent sources of information not derived from [defendant's] statement." At the hearing itself, the trial court noted that "[b]oth parties [had] talked about the need to have this evidentiary *Kastigar* hearing before other things could be done." Consistently with how the parties and trial court have been trying this case, and as did the Court of Appeals in *Oatney II*, we look to *Kastigar* and its progeny in understanding use and derivative use immunity in the context of this particular case.

As noted, *Kastigar* requires more than "a negation of taint" and "imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." 406 US at 460. The trial court in this case has required the state to satisfy that standard as to evidence that was obtained after defendant gave his immunized statement that the state intends to use at defendant's retrial.[7]

---

[7] Noting that this court has had no "occasion to apply the *Kastigar* standard under the Fifth Amendment with respect to 'use and derivative use' immunity

Applying that standard in the context of a witness who has been exposed to immunized information, courts have explained that, even when a witness would testify from personal knowledge, *Kastigar* can be violated in at least two independent, alternative ways that are pertinent to the issue raised in this appeal. First, a *Kastigar* violation can occur if the government uses the immunized information "to motivate another witness to give incriminating testimony." *United States v. Slough*, 641 F3d 544, 549 (DC Cir 2011), *cert den*, 566 US 1043 (2012); *see also North II*, 920 F2d at 942 ("[E]ven where the witness testifies from personal knowledge, use within the meaning of *Kastigar* may occur *** if the immunized testimony influenced the witness'[s] decision to testify."); *Aiken v. United States*, 30 A3d 127, 133 (DC 2011) (*Aiken II*) ("A witness's testimony also must be excluded if it was motivated by exposure to the immunized testimony." (Internal quotation marks omitted.)). Second, a violation can occur if the content of a witness's subsequent testimony is "'shaped, altered, or affected' by such exposure." *United States v. Poindexter*, 951 F2d 369, 373 (DC Cir 1991), *cert den*, 506 US 1021 (1992) (quoting *North I*, 910 F2d at 863); *see also Allen*, 864 F3d at 93 (explaining that, "[a]t a minimum, *** we agree with the D.C. Circuit that the Government is required to prove that [a witness's] exposure to the compelled testimony did not shape, alter, or affect the information that he provided and that the Government used"); *Aiken II*, 30 A3d at 133 (explaining that a prohibited use occurs if a witness's testimony "is in any way shaped, altered, or affected by such exposure, even where the

---

that is based only on a contract," the state contends that, in determining whether evidence derives from defendant's immunized statement, we should apply a "*similar* standard" under which evidence is not excluded if it has only a "tenuous connection to the immunized statement." (Emphasis added.) Specifically, the state points to the "totality of the circumstances" standard described in *State v. Jarnagin*, 351 Or 703, 716, 277 P3d 535 (2012), for "determining whether physical or testimonial evidence derives from or is the product of an earlier *Miranda* violation." According to the state, in determining whether evidence is derived from defendant's immunized statement, we should look to the totality of the circumstances and consider factors that "may serve to attenuate the 'taint,'" including "the amount of time" that has elapsed and "subsequent events that may have dissipated the taint of the earlier violation." (Internal quotation marks omitted.) Although the state acknowledges that the *Jarnagin* standard "is an imperfect fit for these circumstances," it nonetheless contends that the "standard can provide a useful analogy here." However, as explained above, in resolving the issues raised in this appeal we look to *Kastigar* and its progeny.

witness testifies from personal knowledge" (internal quotation marks omitted)).

Once a witness has been exposed to immunized information, it may be extremely difficult for the state to demonstrate that the witness's subsequent testimony is wholly independent of the exposure, particularly when the state fails to memorialize the witness's testimony before the exposure occurs. *See Allen*, 864 F3d at 93 ("The most effective way to demonstrate that a witness's testimony was untainted by exposure to a defendant's immunized testimony is by demonstrating that his or her testimony was unchanged from comparable testimony given before the exposure."). Generalized denials that the exposure shaped, altered, or affected the content of a witness's subsequent testimony are insufficient. *Cf. United States v. Hampton*, 775 F2d 1479, 1487 (11th Cir 1985) ("Obviously, the government's conclusory denials of direct or derivative use are insufficient even to negate taint, much less to carry the government's affirmative burden of tracing all evidence presented to wholly independent sources." (Internal quotation marks omitted.)). Instead, a trial court will need to "parse the evidence" to "'separate the wheat of the witnesses' unspoiled memory from the chaff of [the] immunized testimony.'" *Slough*, 641 F3d at 550 (quoting *North I*, 910 F2d at 862 (brackets in *Slough*)).

Further, as a trial court determines whether an exposed witness's testimony is wholly independent of exposure to the immunized information, witness credibility is an important factor to be examined in conjunction with other evidence in the record. As the Second Circuit explained in *United States v. Kurzer*, 534 F2d 511, 517 (2d Cir 1976), because "[h]uman motivation is often difficult to discern, and a decision is frequently the product of several concurrent influences," a trial court must determine a witness's credibility "not only in terms of his inclination to tell the truth, but also with regard to whether he is truly able to isolate the factors which convinced [the witness] to cooperate."

To reiterate, the state's contention here is that defense arguments that Johnston alone committed the murder could "provide him with a new and independent

motivation to testify such that his testimony would no longer be derivative of his past exposure to the immunized statement." In light of the foregoing principles, that argument suffers from two fundamental flaws.

First, even if we were to assume that the state could demonstrate that Johnston was motivated to testify at defendant's retrial for a reason entirely apart from his prior exposure to defendant's immunized statement, it does not follow, as the state contends, that Johnston's testimony would then be wholly independent of—and not derived from—that exposure and, therefore, admissible. As noted, when exposure to immunized information motivates a witness to cooperate or testify against the immunized party, that is a sufficient reason to exclude the witness's evidence under *Kastigar*.[8] However, contrary to the state's contention, even when a witness is not motivated to testify because of the prior exposure to the immunized information, the testimony may still be prohibited under *Kastigar* if the content of the witness's testimony is altered, shaped, or affected by that exposure. That is true even when the witness has personal knowledge of the circumstances of the crime. *See Slough*, 641 F3d at 550 (explaining that a trial court will need to "parse the evidence" to "separate the wheat of the witnesses' unspoiled memory from the chaff of the immunized testimony" (internal quotation marks and brackets omitted)).

Second, and more fundamentally, the state has not sought to demonstrate in the trial court that Johnston could testify at the retrial consistently with *Kastigar*. Although the court held a pretrial *Kastigar* hearing to determine

---

[8] *See United States v. Helmsley*, 941 F2d 71, 83 (2d Cir 1991), *cert den*, 502 US 1091 (1992) ("In *Kurzer*, there existed a danger of manipulation by government investigators who might immunize a witness and then use the fact of the immunized testimony to anger a subject of the investigation and cause that subject in turn to incriminate the witness. Such a danger directly implicated Fifth Amendment policies, and thus testimony that might have resulted from such manipulation could not be used against the immunized witness."); *Hampton*, 775 F2d at 1488 ("Where the testimony of an immunized witness enables the government to build a case against his co-conspirator, who consequently strikes a plea bargain with prosecutors and agrees to testify against the immunized witness, the testimony of the co-conspirator must be deemed to have been indirectly derived from the testimony of the immunized witness in violation of *Kastigar*.").

whether the state's evidence on retrial was wholly independent of defendant's immunized statement, the state did not seek a ruling from the trial court as to whether Johnston could testify. Instead, the question before the court was whether, and under what circumstances, the defense would "open the door" to permitting the state to call Johnston to testify. That is a qualitatively different question than the *Kastigar* inquiry: whether Johnston's testimony at the retrial could be considered wholly independent of his exposure to defendant's immunized statement. Had the state raised that question in the trial court, defendant would have had the opportunity to litigate his contention that the state is categorically barred from calling Johnston based on the law of the case and the claim and issue preclusion principles that he now raises, and the trial court would have had an opportunity to make a ruling about the admissibility of Johnston's testimony.[9]

In sum, the state's arguments on appeal are unavailing. For that reason, we conclude that the trial court did not err in ruling that, "within the limits of the law and the evidence presented," defense counsel may argue in opening or closing statements that Johnston or someone other than defendant committed the crime or that the state has not proved beyond a reasonable doubt that defendant committed the crime, without opening the door to the state to call "Johnston to present testimony that violates the immunity agreement of Defendant."

---

[9] At the hearings before the trial court, the state indicated that, if Johnston developed a new motive to testify at the retrial, his testimony would not violate defendant's immunity or the Court of Appeals decision in *Oatney II*. For his part, defendant argued that, in *Oatney III*, the Court of Appeals "did not hold that Johnston's testimony is admissible in this retrial." Instead, according to defendant, the Court of Appeals, in *Oatney III*, "trusted the trial court to make the determination" on retrial that, in *Oatney II*, it had held "that Johnston's testimony is out." The trial court here also expressed skepticism that Johnston could testify in the retrial, explaining that "Johnston's statements were all predicated on [the state] playing that tape to *** Johnston" and that, in analyzing the Court of Appeals' reasoning, "it's clear that but for [defendant's] immunized statement[,] *** Johnston wouldn't have said anything. And that's where we're at." However, that discussion occurred in the context of deciding what defense actions would open the door to Johnston's testimony and not in the context of a *Kastigar* hearing at which the state would have borne the burden of establishing that Johnston's testimony was wholly independent of his exposure to defendant's immunized statement.

C.  *Defendant's Cross-Assignment of Error*

Finally, as noted above, defendant raises a cross-assignment of error, contending that "[t]he retrial court erred when it ruled that [defendant] would open the door to testimony by Johnston if [defendant] presented the judgment of conviction of Johnston for the aggravated murder of [the victim] because Johnston's conviction was derived from [defendant's] immunized statement." A cross-assignment of error is appropriate when, among other things, a respondent contends that the trial court erred in making an intermediate ruling and that, if the appellant succeeds in obtaining a reversal, the intermediate ruling should be corrected. *See* ORAP 5.57 (describing conditions for raising a cross-assignment of error). Having upheld the trial court's order on appeal, it is unnecessary for us to resolve whether defendant's contention is properly raised by way of a cross-assignment of error or to address the merits of that contention.

The order of the circuit court is affirmed.